# EXHIBIT A

## AFFIDAVIT OF LINDA GREEN

**STATE OF ALABAMA** )
)
**MADISON COUNTY** )

Before me, a notary public in and for said state and county, personally appeared Linda Green, after being first duly sworn, deposes and says as follows:

1. My name is Linda Green. I am a resident of Alabama. I am currently employed as Executive Vice President of the Wealth Management division of Colonial Bank, N.A. and, in such capacity, file this affidavit in support of Colonial's motion seeking summary judgment in the lawsuit filed by Susan Guy, former Family Insurance Manager employed in Colonial's Wealth Management division.

2. I am authorized to make this affidavit, and I am competent to testify at trial regarding the statements made in this affidavit.

3. Colonial Bank, N.A. ("Colonial") is a National Association with its principal place of business located in Montgomery, Alabama and within the jurisdiction of the United States District Court for the Middle District of Alabama. Colonial offers a broad line of retail and commercial banking products and services including checking and savings accounts, personal and commercial loans, online banking, credit card and merchant services, as well as treasury management, investment services and private banking and trust services. Colonial employs over 4,000 employees among its more than 300 banking offices in Florida, Alabama, Georgia, Nevada and Texas. Through its Wealth Management division, Colonial's wholly-owned subsidiaries, which include Colonial Investment Services, Inc. and Colonial Investment Services of Florida, Georgia, Nevada and Tennessee, offer insurance products and fixed annuities for sale to the public. These subsidiaries are regulated by each state's department of

insurance. Colonial Brokerage, Inc. offers investment services, *e.g.*, stocks, bonds, mutual funds and variable annuities and is regulated by the NASD. These subsidiaries are regulated by each state's department of insurance.

4. At the time of the events alleged in her Complaint, Ms. Susan Guy was employed as the Manager of the Family Insurance section of Colonial's Wealth Management division. Ms. Guy held that position from March 1997 until Colonial eliminated the position on January 18, 2005, as part of a comprehensive restructuring of the Wealth Management division.

5. As that Family Insurance Manager, Ms. Guy was responsible for management, development and implementation of all insurance programs within Colonial's Wealth Management division. Her position included responsibility for training all branch personnel in making referrals and management of all platform licensed agents in the sale and promotion of annuity life insurance and long-term care products. She was also responsible for training all lending personnel in the sale of bank products and services with a concentration on insurance products. As set forth in her job description, Ms. Guy was ultimately responsible for increasing non-interest income to the bank and for retaining customers through the provision of insurance products and services. Furthermore, Ms. Guy was responsible for motivating employees for insurance sales purposes. A true and correct copy of the job description for the Family Insurance Manager position is attached hereto as Attachment No. 1.

6. In January 2005, Colonial eliminated several positions within the Wealth Management division, including the Family Insurance Manager position. Although Colonial offered Ms. Guy a severance package, as well as the opportunity to reapply for other positions within Colonial, she rejected both and has not reapplied for another position within Colonial.

7.      Historically, Colonial has offered its customers a wide array of investment products and services through its Wealth Management division, including fixed and variable annuities, insurance, stocks, bonds, mutual funds, etc. Prior to 2005, Colonial offered these investment products to its customers principally through two separate sections. The Family Insurance section was responsible primarily for the marketing and sale of fixed annuities and insurance products (life and long-term care products) through approximately 350 Licensed Bankers. The Family Insurance section provided sales training and product support to the Licensed Bankers *via* the Platform Annuity Agent Trainers -- Kitty Graham and Terri Meeves. Ms. Guy managed both Trainers until Colonial eliminated her position in January 2005. Although Ms. Guy was required by law to hold a state insurance license to sell those products in her capacity as Family Insurance Manager, she was not required to hold NASD licenses and, in fact, did not oversee or provide training regarding NASD licensed products to Colonial employees, *e.g.*, stocks, bonds, mutual funds and variable annuities.

8.      In contrast, the Product Management section was responsible for product and sales training for approximately 30 NASD licensed Financial Consultants, *i.e.*, brokers, who, in turn, marketed and sold NASD licensed products to Colonial customers. Colonial assigned a sales territory to each Financial Consultant that included designated Colonial branch banks. Both the Financial Consultant and the branch banks generated customer referrals.

9.      In mid-2004, as a result of concerns regarding the productivity and profitability of its Wealth Management division, the Wealth Management division began undertaking the lengthy and comprehensive process of restructuring the division for the purpose of increasing revenue and profitability. In furtherance of that effort, Colonial promoted me (then age 53) in May 2004 to the position of Executive Vice President of the division. In September 2004, I

began to actively explore engaging the Huntington Investment Company ("Huntington") to serve as an outside consultant for a three-year period to review the structure of the division and to provide advice and recommendations for improving performance and overall profitability of the division. Huntington is a comparably sized financial institution and an established consultant for banks. I ultimately selected Huntington as Colonial's consultant because of its similarity in number of branches and deposit size, and because of its reputation in successfully generating investment revenue.

10. As a part of the review process, Huntington, in conjunction with the Wealth Management division, began analyzing Colonial's investment and insurance program by comparing certain categories of its performance to industry performance benchmarks. In particular, they examined deposit sales penetration, deposit revenue penetration, annual sales production and annual revenue production for NASD licensed Financial Consultants as well as Licensed Bankers (insurance license only). The results of that analysis were disturbing. Huntington found that the Wealth Management division significantly underperformed the industry average in each category, including the revenue and profitability of its Fixed Annuity Platform. The following chart reflects the results of Colonial's analysis:

| DEPOSIT SALES PENETRATION[1] | |
|---|---|
| Colonial | 2.2% |
| Industry Average | 3.4% |
| Top Quartile | 4.6% |
| Huntington | 6.4% |
| **DEPOSIT REVENUE PENETRATION[2]** | |
| Colonial | $1,107 |
| Industry Average | $1,901 |
| Top Quartile | $2,491 |
| Huntington | $3,360 |

---

[1] This category reflects the sales (dollars invested) of mutual funds and annuities and life insurance premiums, all divided by the bank's retail deposits.
[2] This category represents the Investment program revenue divided by the bank's retail deposits (divided by a million).

4

| ANNUAL REVENUE PRODUCTION[3] | |
|---|---|
| Colonial | $10,561 |
| Industry Average | $19,287 |
| Top Quartile | $24,295 |
| Huntington | $36,679 |
| **ANNUAL SALES PRODUCTION[4]** | |
| Colonial | $357,217 |
| Industry Average | $428,600 |
| Top Quartile | $539,889 |
| Huntington | $815,088 |

11. Additionally, the Wealth Management division did not meet its internal goals. Revenues for four of the five sections of the division decreased in 2004, and none of the five sections met their budgeted goals.

| Financial Planning Service | 2003 Actual | 2004 Budget | 2004 Actual |
|---|---|---|---|
| Colonial Asset Management | $ 140,000 | $ 358,000 | $ 72,000 |
| Trust | $ 2,187,700 | $ 2,000,000 | $ 1,428,000 |
| Investments/Discount Brokerage | $ 5,703,200 | $ 6,223,300 | $ 5,293,000 |
| Fixed Annuity Platform Program | $ 6,093,800 | $ 6,833,300 | $ 5,545,600 |
| Insurance Sales | $ 990,600 | $ 1,757,731 | $ 1,031,400 |
| **TOTAL** | **$15,115,300** | **$17,172,331** | **$13,370,000** |

12. A more detailed examination of Fixed Annuity revenues likewise revealed that the Fixed Annuity sales for 2004 in Alabama and Florida were well below the established goal and, in fact, had substantially decreased from the preceding year.

| FIXED ANNUITY REVENUES | | | |
|---|---|---|---|
| STATE | 2003 Actual | 2004 Budget | 2004 Actual |
| Alabama | $3,179,539 | $3,416,550 | $2,765,699 |
| Florida | $1,985,000 | $2,451,000 | $2,053,000 |

13. The individual performance of Licensed Bankers was equally poor. Only 48 of the 325 Licensed Bankers met their 2003 sales goal, and 116 sold no Family Insurance products, *i.e.*, insurance or fixed annuities. Furthermore, although the number of Licensed Bankers

---
[3] This category represents the average revenue derived from Licensed Platform Banker sales.
[4] This category represents average revenue produced by NASD licensed representatives.

5

increased to 354 in 2004, only 45 met their 2004 goals, and 103 sold no Family Insurance products.

| LICENSED BANKER PERFORMANCE | | | |
|---|---|---|---|
| **2003** | | | |
| Total Number Licensed Bankers | Total Licensed Bankers Making Goal | Total Licensed Bankers With No Sales | Total Licensed Bankers With Sales Over $1 Million |
| 325 | 48 | 116 | 23 |
| **2004** | | | |
| 354 | 45 | 103 | 24 |

In sum, the overall performance of the Wealth Management division, including the revenues generated by Ms. Guy's Family Insurance section, reflected a poorly performing division in need of a top-to-bottom restructuring.

14. Based on its poor performance, I asked Huntington to prepare a restructuring plan for the Wealth Management division. The restructuring plan was not directed at the elimination of any particular position or employee, but rather, it focused on the development of concrete goals and recommendations directed at improving performance and increasing profitability of the division.

15. During the Fall of 2004, in consultation with Colonial, Huntington developed a series of goals and strategies for the Wealth Management division designed to improve the division's partnership with the retail bank, with the ultimate goal of achieving performance in the top quartile of the industry. In addition to the structural changes that ultimately resulted in the elimination of Susan Guy's position, Colonial implemented a comprehensive plan to achieve the new goals established for the division. The ultimate restructuring, which remains ongoing, included, *inter alia*, the following reforms:

- Elimination of unnecessary positions through consolidation of positions and duties;

- Restructuring of broker compensation models to provide consistency in pay and foster teamwork between Licensed Bankers and Financial Consultants;

- Implementation of Huntington Team Leader model;

- Establishment of monthly executive summary reporting – sales, operation, compliance;

- Evaluation of vendors/products to establish Preferred Product list;

- Renegotiation of selling agreements with major vendors to improve terms;

- Reorganization and upgrading product and sales training curriculum and quality of training and support provided to Financial Consultants and Licensed Bankers;

- Implementation of on-line trading;

- Creation of a Sales Desk to serve as an immediate resource for Licensed Bankers in all 300-plus Colonial branches;

- Revision of Financial Consultant employment agreements;

- Reduction of office space from three floors to one floor;

- Updating of supervisory procedures;

- Updating Compliance Manual and Business Continuity Plan;

- Creation of a partnership with UVEST Financial Services to provide clearance, settlement and custody services for Colonial customers; and

- Implementation of a rewards/incentive plan for Licensed Bankers and Financial Consultants

In sum, the elimination of positions through the organizational restructuring of the Wealth Management division was only a small part of the comprehensive reforms Colonial implemented and which Colonial continues to implement today.

16. One immediate challenge Huntington and Colonial recognized was the fact that the existing structure of the division impeded communication and cooperation among its different departments/sections and, in particular, between Licensed Bankers who sold fixed annuities and insurance products under the Family Insurance section, and Financial Consultants who, operating under the Brokerage section, sold NASD licensed products, *e.g.*, stocks, bonds, mutual funds and variable annuities, and Insurance Specialists, who sold insurance (both fixed and NASD licensed Variable Insurance). Although part of the same division, we found that the Family Insurance section and the Product Management section were essentially operating independently of one another and often were competing directly for the same banking customer. Furthermore, there was little in the way of cooperative effort between the sections of the division and Colonial's retail and commercial banking partners. Consequently, Colonial concluded that the organizational structure of the division presented a significant impediment to the goal of increasing and deepening customer relationships and to the ultimate goal of increasing productivity and profitability.

17. To address some of these systemic problems, and specifically to promote greater communication and collaboration among the division's various sections, Huntington recommended adoption of a hybrid investment model known as the Team Delivery model. In contrast to the existing structure, which essentially forced each section of the Wealth Management division to fend for itself, the Team Delivery model was designed to provide a greater focus on the delivery of investment services to customers based on their specific investment needs through the united and cooperative effort of Licensed Bankers, Financial Consultants, retail and commercial banking partners, support staff and product specialists. In other words, under the Team Delivery model, the entire apparatus of the division, in conjunction

with the complete apparatus of Colonial Bank, would work to create and to further customer relationships and to support and to deliver a total banking solution for customers based on a personalized financial strategy.

18. Implementation of the Team Delivery model directly and significantly affected the Family Insurance and Product Management sections, as well as the existing positions in those sections. In particular, as previously stated, prior to the implementation of the Team Delivery model in early 2005, the division employed two separate sections to market and to sell traditional investments products and services to customers. The Family Insurance section was responsible for selling fixed annuities and insurance products through Licensed Bankers. Susan Guy was the Family Insurance Manager, and she directed and supervised Kitty Graham and Terri Meeves, who were the Trainers responsible for providing sales training and product support to the Licensed Bankers with respect to insurance and fixed annuity products. However, Ms. Guy, Ms. Graham and Ms. Meeves had no duties or responsibilities regarding the marketing and sale of NASD licensed products, nor could they perform such duties without the necessary NASD licenses. In contrast, the Product Management section was responsible for providing sales training and product support for Colonial's NASD licensed Financial Consultants (brokers) who, in turn, marketed and sold traditional investment and brokerage services, *e.g.*, stocks, bonds, mutual funds and variable annuities.

19. As part of the transition to the Team Delivery model recommended by Huntington, the division chose to eliminate the Family Insurance and Product Management sections and to consolidate the functions of the two sections into a single section. As part of that consolidation, I made the decision to eliminate several positions, including the position of Family Insurance Manager, formerly held by Susan Guy, the two Platform Annuity Agent

Trainer positions, formerly held by Kitty Graham and Terri Meeves, and the Product Management position, formerly held by Ann Fuller. In turn, the division created several new positions which consolidated the functions of the former Family Insurance and Product Management sections. Under the new structure, the division would market all of its investment products within a single section. The division also created the new position of Program Director to oversee the sales training of Licensed Bankers and NASD licensed Financial Consultants, and it created two Regional Sales and Development Wholesaler positions ("Wholesalers") to train both Licensed Bankers selling fixed annuities and insurance products and Financial Consultants selling NASD licensed investment products. In other words, there would now be a single section responsible for all investment products.

20. I recommended the elimination of Susan Guy's position based on my good-faith business judgment that the organizational restructuring of its Wealth Management division, in conjunction with many other changes implemented by the Wealth Management division, would best further the goals of increasing efficiency, revenues and profitability. That business judgment was not merely the product of a whim or a reshuffling of the organizational chart, but rather, it was the direct result of a lengthy and introspective process undertaken by the Wealth Management division in conjunction with Huntington, a well-respected and independent banking consultant. At no time did I or anyone else who participated in the restructuring process consider the age or sex of any employee in eliminating positions during the organizational restructuring.

21. On January 18, 2005, I, along with Tara Gibson, the Human Resources Area Manager for Colonial's Montgomery BancGroup, met with Susan Guy in Colonial's Montgomery corporate offices. I informed Ms. Guy that Colonial was eliminating her position as part of the organizational restructuring of the Wealth Management division, and I thanked her

for her service to Colonial At no time during the meeting did Ms. Guy ever inquire about the availability of another position within the Wealth Management division or within Colonial Bank. Furthermore, when Tara Gibson reviewed the terms of the proposed separation agreement with Ms. Guy, she informed her that she had the right to reapply for another open position within the company. I also informed Ms. Guy that if she successfully reapplied for another position, her termination pursuant to the elimination of her Family Insurance Manager position would not be treated by Colonial as a break in service. Although Colonial offered Ms. Guy a severance package as well as the opportunity to reapply for other positions within Colonial, she rejected both and has not reapplied for another position within Colonial.

22. I have reviewed Ms. Guy's Complaint. Although she alleges that Colonial only eliminated positions of women over the age of 40 during the reorganization, her allegation is incorrect. In particular, the elimination of the initial four positions held by Ms. Guy, Ms. Graham, Terri Meeves and Ann Fuller was only a small portion of the total number of positions eliminated during the organizational restructuring of the Wealth Management division. Over the course of the reorganization, the division eliminated 29 positions. Six of those positions were held by male employees; 21 of those positions were held by employees under the age of 40; and 17 of those 21 positions were held by employees under the age of 30. Additionally, the positions eliminated were not limited to the Family Insurance section, but rather extended to virtually every section of the Wealth Management Division, including Operations, Compliance, Program Area and Trust. A true and correct list of the positions eliminated pursuant to the reorganization of the Wealth Management division is attached hereto as Attachment No. 2.

23. In sum, the elimination of Susan Guy's position as Manager of the Family Insurance section of Wealth Management was not part of a concerted effort to rid the division of

older female employees. Rather, the elimination of her position was part of a comprehensive organizational restructuring which included the elimination of over two dozen positions within various sections of the Wealth Management division; positions that were held by men and women of diverse age groups. Furthermore, of the 29 positions eliminated, 16 employees (55%) successfully reapplied for other positions within Colonial Bank.

24. Ms. Guy's allegation that Sean Tesoro merely assumed her former duties and is now performing the same job is also incorrect. Although Mr. Tesoro has assumed some of Ms. Guy's former duties related to insurance and fixed-rate annuity products, those duties comprise only a portion of the Program Director's duties. Unlike the Family Insurance Manager, the new Program Director is responsible for duties requiring various NASD licenses and an extensive knowledge of NASD products. In particular, the Program Director supervises the sales training and product support provided by two newly created Regional Sales and Development Wholesaler positions held by Cary Guffey and Time Lewis. Consequently, the Program Director is required to hold certain NASD licenses and to be in good standing with the U.S. Securities and Exchange Commission and the National Association of Securities Dealers. The job description for the Program Director position, which I created and approved pursuant to the assistance and recommendation of Huntington, explicitly sets forth the NASD licensing requirements necessary to perform the job. A true and correct copy of the job description for the Program Director position is attached hereto as Attachment No. 3.

25. In evaluating Susan Guy's future within Wealth Management, I was faced with the undeniable fact that she could not serve as the Program Director because she lacked NASD licensing and had no experience whatsoever regarding the sale and marketing of NASD regulated products. Furthermore, Ms. Guy had an opportunity to obtain NASD licensing and, in

fact, established that aspiration as a personal goal during her 2003 Employee Self Evaluation. The division not only encouraged that goal, but Helena Duncan, Executive Vice-President of Colonial Bank, directed her to obtain her Series 7 license. Nevertheless, Ms. Guy did not follow these directives and never sat for a single NASD licensing exam. Without proper licensing, Ms. Guy lacked an essential and necessary qualification for the Program Director position. Consequently, I concluded that she was not qualified to coordinate and implement training related to the marketing and sale of NASD related products.

26.   On or about January 24, 2005, I promoted Sean Tesoro internally from the position of Financial Consultant to the new Program Director position. At the time of his promotion, Mr. Tesoro was 33 years old. He had obtained a B.A. from Yale University in 1994. After he graduated from Yale, Mr. Tesoro was employed as a regional manager with Putnam Investments from 1994 to 1997. From 1997 through 1998, he served as Chief of Staff for economist Arthur Laffer, founder of Laffer Associates, an economic research and consulting firm that provides investment-research services to institutional asset managers. From 1999 through January 2005, he worked as a regional manager for various investment companies, including Sun Life Financial, Allstate Financial Distributors, The Travelers, MassMutual Financial Group and, ultimately, as a Financial Consultant (broker) for Colonial, where he was responsible for marketing and selling investment products through the five Colonial branch banks located in his sales territory. As a Colonial Financial Consultant, Mr. Tesoro was also responsible for training the Licensed Bankers operating in his sales territory with respect to the sale of insurance and fixed-rate annuities. In sum, Mr. Tesoro had over 10 years of experience marketing and selling investment products to clients, including insurance, fixed-rate annuities and NASD licensed products.

27.     At the time he was promoted to the Program Director position, Mr. Tesoro had successfully completed the NASD Series 6 Exam (Investment Company and Variable Contracts Products Representative), the NASD Series 7 Exam (General Securities Registered Representative), and the NASAA Series 63 Exam (Uniform Securities Exam). Moreover, Mr. Tesoro has been licensed by the State of Alabama to sell insurance and fixed annuity products since 2002.

28.     I also found that Mr. Tesoro was very professional in his deportment and was well-respected among his peers, the various branches in his sales territory, and product vendors. In fact, he became familiar with Colonial Bank while employed in a regional sales position by MassMutual, *i.e.*, one of Colonial's product vendors. Mr. Tesoro was responsible for the Colonial account and, in that capacity, trained Colonial's Financial Consultants in his territory with respect to the marketing and to the sale of investment products offered by MassMutual, including insurance, fixed-rate annuities and NASD licensed products.

29.     In sum, I found that Mr. Tesoro was well-qualified for the position and that he specifically was qualified to perform many job duties which Susan Guy never performed as Family Insurance Manager and, in fact, could not perform without the requisite NASD licensing. Based on these factors, I chose to promote Mr. Tesoro to the new Program Director position.

**FURTHER THE AFFIANT SAYETH NOT.**

_____
Linda Green

**SWORN TO AND SUBSCRIBED BEFORE ME** on this the ___14th___ day of August 2006.

(SEAL)

_____
Notary Public
My Commission Expires: _11-17-2009_