**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**

| | | |
|---|---|---|
| SUSAN H. GUY | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **CIVIL ACTION NO.:** |
| **vs.** | ) | **2:06CV271-WKW** |
| | ) | |
| **THE COLONIAL BANCGROUP, INC.** | ) | |
| **and COLONIAL BANK, N.A.,** | ) | **DRB Magistrate Judge Assigned** |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION**
**FOR SUMMARY JUDGMENT OF DEFENDANTS**
**COLONIAL BANK, N.A. AND THE COLONIAL BANCGROUP, INC.**

**COME NOW** Defendants, The Colonial BancGroup, Inc. and Colonial Bank, N.A. (collectively, "Colonial Bank") and respectfully submit this memorandum of law in support of its motion for summary judgment filed contemporaneously herewith. For the reasons set out below, the Court should grant summary judgment in favor of Colonial Bank and against Susan Guy ("Plaintiff" or "Guy") on all of her claims.

## I.    SUMMARY OF ARGUMENT

This case is before the court on a motion for summary judgment filed by Colonial. Plaintiff Guy alleges that Colonial discriminated against her on the basis of age and gender in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, and the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621, *et seq.*, when it eliminated her position as Family Insurance Manager and subsequently promoted a younger male, Sean Tesoro, to the newly created position of Program Director. In essence, Guy contends that Colonial did not eliminate her position, but rather, merely re-titled her position and assigned her duties to Tesoro because he was a younger male employee.

Guy's claims against Colonial fail as a matter of law and are due to be dismissed because she cannot establish a *prima facie* case for either claim and because she cannot show that Colonial's legitimate and nondiscriminatory reasons for its actions were a pretext to discriminate against Guy based on her age or gender. As will be established herein, Colonial eliminated Guy's position, as well as 28 other positions within the Wealth Management division, as part of a comprehensive reorganization of the division for the purpose of increasing the division's productivity and profitability. Moreover, Mr. Tesoro did not merely replace Guy and assume her former Family Insurance Manager duties; rather, her duties were subsumed into the more expansive duties of the Program Director position for which Guy lacked the objective minimum qualifications. In particular, Guy was not qualified for the Program Director position because she had no brokerage experience and was not licensed by the National Association of Securities Dealers ("NASD") to sell NASD licensed products such as stocks, bonds, mutual funds and variable annuities. In contrast, at the time of his promotion, Sean Tesoro held several NASD licenses and had over 10 years of experience marketing and selling investment products to clients, including insurance, fixed-rate annuities and NASD licensed products.

Even assuming *arguendo* that Guy could establish a prima facie case under Title VII or the ADEA, Colonial's decisions to eliminate Guy's position and to appoint Sean Tesoro to the new Program Director position were based on legitimate, nondiscriminatory reasons, including Colonial's good faith business judgment that both decisions ultimately would improve the efficiency and profitability of the Wealth Management division.

For these reasons, as set out more fully below, the Court should grant Colonial's Motion for Summary Judgment and enter an order in its favor on all of Plaintiff Guy's claims.

## II.     SUMMARY JUDGMENT STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Jameson v. Arrow Co.*, 75 F.3d 1528 (11th Cir. 1996). The party asking for summary judgment bears the initial burden of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing, or by pointing out to, the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322-24.

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing there is a genuine issue for trial.' " *Id.* at 324. Thus, in response to Colonial's submissions, Guy must by her own affidavits, deposition excerpts, answers to interrogatories or other proper evidence, designate the specific material facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324. A dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Guy must meet her burden by doing more than "simply show[ing] that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

475 U.S. 574, 586 (1986).  Furthermore, "[i]n an employment discrimination case, the plaintiff must produce sufficient evidence to support an inference that the defendant employer based its employment decision on an illegal criterion."  *Jameson*, 75 F.3d at 1531; *see also Alphin v. Sears Roebuck & Co.*, 940 F.2d 1497, 1500 (11th Cir. 1991).

Thus, to the extent that Colonial shows that Guy will be unable to offer evidence sufficient to establish an element essential to any of her claims on which she will bear the burden of proof at trial or to the extent that Colonial argues that such a deficiency exists and Guy fails to offer the Court sufficient evidence in her responsive summary judgment submissions, Colonial is entitled to summary judgment.

### III.    NARRATIVE SUMMARY OF FACTS[1]

**A.    COLONIAL**

**1.    THE NATURE OF COLONIAL'S OPERATIONS**

Colonial Bank, N.A. is a National Association with its principal place of business located in Montgomery, Alabama.  Affidavit of Linda Green "Green Aff." Ex. A at ¶3.[2]  Colonial offers a broad line of retail and commercial banking products and services including checking and savings accounts, personal and commercial loans, online banking, credit card and merchant services, as well as treasury management and private banking and trust services.  *Id.*  Colonial employs over 4,000 employees among its more than 300 banking offices in Florida, Alabama, Georgia, Nevada and Texas.  *Id.*  Through its Wealth Management division, Colonial's wholly-owned subsidiaries, which include Colonial Investment Services, Inc. and Colonial Investment Services of Florida, Georgia, Nevada and Tennessee, offer insurance products and fixed

---

[1]  Colonial is cognizant that as the moving party it must rely on undisputed material facts, or where there is a factual dispute, on the version of the facts for which Guy has presented proper evidence.  Thus, while Colonial sets forth Guy's version of certain events in this brief and assumes *arguendo* that her account is true, Colonial does not concede the truth of Guy's version of events for any other purpose.

[2]  All exhibits referred to hereon are set forth in a separate volume of exhibits submitted contemporaneously herewith.

annuities for sale to the public. *Id.* These subsidiaries are regulated by each state's department of insurance. *Id.* Colonial Brokerage, Inc. offers investment services, *e.g.*, stocks, bonds, mutual funds and variable annuities and is regulated by the NASD. *Id.*

Colonial is an equal opportunity employer and vigorously promotes a harassment and discrimination free work place. As set out in Colonial's Human Resources Policy manual, an employee's race, sex, religion, color, national origin, age, veteran status, disability or any other factor protected by law, may not be considered as a basis for making any employment decision regarding the employee, including, but not limited to any decisions relating to hiring, promotion, training, job assignments, compensation, discipline, discharge and other terms and conditions of employment. *See* Colonial Human Resources Policy Manual, Ex. B at 5.

**B.    GUY'S EMPLOYMENT WITH COLONIAL**

At the time of the events alleged in her Complaint, Ms. Susan Guy (age 44) was employed as the Manager of the Family Insurance section of Colonial's Wealth Management division. Green Aff., Ex. A at ¶4. Ms. Guy held that position from March 1997 until Colonial eliminated the position on January 18, 2005, as part of a comprehensive restructuring of the Wealth Management division. As the Family Insurance Manager, Ms. Guy was responsible for the management, development and implementation of all insurance programs for Colonial's Wealth Management division. *Id*; Family Insurance Manager Job Description, Ex. G. Her position included responsibility for training all branch personnel in making referrals and management of all platform licensed agents in the sale and promotion of annuity life insurance and long-term care products. Green Aff., Ex. A at ¶5; Family Insurance Manager Job Description, Ex. G. She was also responsible for training all lending personnel in the sale of bank products and services with a concentration on insurance products. Green Aff., Ex. A at ¶5;

Family Insurance Manager Job Description, Ex. G.  As set forth in her job description, Guy was ultimately responsible for increasing non-interest income to the bank and for retaining customers through the provision of insurance products and services.  Green Aff., Ex. A at ¶5; Family Insurance Manager Job Description, Ex. G.  Furthermore, Ms. Guy was responsible for motivating employees for insurance sales purposes.  Green Aff., Ex. A at ¶5; Family Insurance Manager Job Description, Ex. G.

As will be explained in further detail below, in January 2005, Colonial eliminated several positions within its Wealth Management divisions, including the Family Insurance Manager position, as part of the first phase of a comprehensive restructuring of the division.  Green Aff., Ex. A at ¶6.  Although Colonial offered Guy a severance package, as well as the opportunity to reapply for other positions within Colonial, she rejected both and has not reapplied for another position within Colonial.  *Id.*

Guy does not allege in her Complaint, and never alleged while she was employed by Colonial, that she was discriminated against on the basis of sex or age or that she was subjected to or otherwise overheard any inappropriate comments regarding her sex or her age.[3]

## C.   THE WEALTH MANAGEMENT DIVISION

Historically, Colonial has offered its customers a wide array of investment products and services through its Wealth Management division, including fixed and variable annuities, insurance, stocks, bonds, mutual funds, etc.  *Id.* at ¶7.  Prior to 2005, Colonial offered these investment products to its customers principally through two separate sections.[4]  *Id.*  The Family Insurance section was responsible primarily for the marketing and sale of fixed annuities and

---

[3]  Had Guy ever complained of acts of gender or age discrimination while she was employed by Colonial, Colonial would have taken prompt remedial action pursuant to its anti-discrimination policy.
[4]  Colonial also provided other services through its Wealth Management division, including private banking, trust services and asset management.

insurance products (life and long-term care products) through approximately 350 Licensed Bankers. *Id.* The Family Insurance section provided sales training and product support to the Licensed Bankers *viá* two Platform Annuity Agent Trainers ("Trainers") – Plaintiff Kitty Graham and Terri Meeves -- who were managed by Guy. *Id.* Guy served in that position from September 15, 2003 until Colonial eliminated her position on January 18, 2005. *Id.* Although the Family Insurance Manager and Trainers were required by law to hold a state insurance license to sell those products and services, they were not required to hold NASD licenses and, in fact, did not provide training regarding NASD licensed products, *e.g.*, stocks, mutual funds, variable annuities, bonds, etc.[5] *Id.*

The Product Management section was responsible for product and sales training for approximately 30 NASD licensed Financial Consultants (brokers) who, in turn, marketed and sold traditional investments, *i.e.*, NASD licensed products to bank customers. *Id.* at ¶8. Colonial assigned a sales territory to each Financial Consultant that included designated Colonial branch banks. *Id.* Both the Financial Consultant and the branch banks generated customer referrals. *Id.*

As will be explained in detail below, however, in 2005, following a comprehensive review of the division's operations, Colonial significantly modified the organizational structure of the Wealth Management division, including the Family Insurance and Product Management sections.

1. **THE WEALTH MANAGEMENT DIVISION WAS SIGNIFICANTLY UNDERPERFORMING.**

In mid-2004, as a result of concerns regarding the productivity and profitability of the Wealth Management division, Colonial commenced the lengthy and comprehensive process of restructuring the division for the purpose of increasing revenue and profitability. *Id.* at ¶9. In

---

[5] A Licensed Banker is a banker who has obtained his or her state insurance license.

furtherance of that effort, Colonial promoted Linda Green (then age 53) in May 2004 to the position of Executive Vice President of the Wealth Management division. *Id.* In September 2004, Ms. Green began to actively explore engaging the Huntington Investment Company ("Huntington") to serve as an outside consultant for a three-year period to review the structure of the division and to provide advice and recommendations for improving performance and overall profitability.[6] *Id.* As a part of that process, Huntington analyzed Colonial's investment and insurance program by comparing certain categories of its performance to industry performance benchmarks. *Id.* In particular, they examined deposit sales penetration[7], deposit revenue penetration[8], annual sales production[9] and annual revenue production[10] for NASD licensed Financial Consultants as well as Licensed Bankers (insurance license only). *Id.*

The results of that analysis were disturbing. *Id.* at ¶10. Huntington found that the Wealth Management division significantly underperformed the industry average in each category, including the revenue and profitability of its Fixed Annuity Platform. *Id.* The following chart reflects the results of Colonial's analysis:

| DEPOSIT SALES PENETRATION | |
|---|---|
| Colonial | 2.2% |
| Industry Average | 3.4% |
| Top Quartile | 4.6% |
| Huntington | 6.4% |
| DEPOSIT REVENUE PENETRATION | |
| Colonial | $1,107 |
| Industry Average | $1,901 |
| Top Quartile | $2,491 |
| Huntington | $3,360 |

---

[6] Huntington is a comparably sized financial institution and an established consultant for banks. Colonial ultimately selected Huntington as its consultant because of its similarity in number of branches and deposit size, and because of its reputation in successfully generating investment revenue.

[7] This category reflects the sales (dollars invested) of mutual funds and annuities and life insurance premiums, all divided by the bank's retail deposits.

[8] This category represents the Investment program revenue divided by the bank's retail deposits (divided by a million).

[9] This category represents average revenue produced by NASD licensed representatives.

[10] This category represents the average revenue derived from Licensed Platform Banker sales.

| ANNUAL REVENUE PRODUCTION | |
|---|---|
| Colonial | $10,561 |
| Industry Average | $19,287 |
| Top Quartile | $24,295 |
| Huntington | $36,679 |
| ANNUAL SALES PRODUCTION | |
| Colonial | $357,217 |
| Industry Average | $428,600 |
| Top Quartile | $539,889 |
| Huntington | $815,088 |

*Id.* at ¶10.

Additionally, the division did not meet its internal goals. *Id.* at ¶11. Revenues for four of the five sections of the division decreased in 2004, and none of the five sections met their budgeted goals. *Id.*

| Financial Planning Service | 2003 Actual | 2004 Budget | 2004 Actual |
|---|---|---|---|
| Colonial Asset Management | $    140,000 | $    358,000 | $      72,000 |
| Trust | $ 2,187,700 | $ 2,000,000 | $ 1,428,000 |
| Investments/Discount Brokerage | $ 5,703,200 | $ 6,223,300 | $ 5,293,000 |
| Fixed Annuity Platform Program | $ 6,093,800 | $ 6,833,300 | $ 5,545,600 |
| Insurance Sales | $    990,600 | $ 1,757,731 | $ 1,031,400 |
| **TOTAL** | **$15,115,300** | **$17,172,331** | **$13,370,000** |

*Id.*

A more detailed examination of Fixed Annuity revenues likewise revealed that the Fixed Annuity sales for 2004 in Alabama and Florida were well below the established goal and, in fact, had substantially decreased from the preceding year. *Id.* at ¶12.

| FIXED ANNUITY REVENUES | | | |
|---|---|---|---|
| STATE | 2003 Actual | 2004 Budget | 2004 Actual |
| Alabama | $3,179,539 | $3,416,550 | $2,765,699 |
| Florida | $1,985,000 | $2,451,000 | $2,053,000 |

*Id.*

The individual performance of Licensed Bankers was equally poor. *Id.* at ¶13. Only 48 of the 325 Licensed Bankers met their 2003 sales goal, and 116 sold no Family Insurance products, *i.e.*, insurance or fixed annuities. *Id.* Furthermore, although the number of Licensed Bankers increased to 354 in 2004, only 45 met their 2004 goals, and 103 sold no Family Insurance products. *Id.*

| LICENSED BANKER PERFORMANCE | | | |
|---|---|---|---|
| 2003 | | | |
| Total Number Licensed Bankers | Total Licensed Bankers Making Goal | Total Licensed Bankers With No Sales | Total Licensed Bankers With Sales Over $1 Million |
| 325 | 48 | 116 | 23 |
| 2004 | | | |
| 354 | 45 | 103 | 24 |

*Id.* In sum, the overall performance of the Wealth Management division, including the revenues generated by Guy's Family Insurance section, reflected a poorly performing division in need of comprehensive restructuring. *Id.*

2.    COLONIAL ADOPTED A COMPREHENSIVE PLAN TO RESTRUCTURE THE WEALTH MANAGEMENT DIVISION.

Based on its poor performance, Ms. Green requested that Huntington prepare a restructuring plan for the Wealth Management division. *Id.* at ¶14. The restructuring plan was not directed at the elimination of any particular position or employee, but rather, it focused on the development of concrete goals and recommendations directed at improving performance and increasing profitability of the division. *Id.*

During the Fall of 2004, in consultation with Colonial, Huntington developed a series of goals and strategies for the Wealth Management division designed to improve its performance with the ultimate goal of achieving performance in the top quartile of the industry. *Id.* at ¶15. In addition to the structural changes, which ultimately resulted in the elimination of Guy's position,

Colonial implemented a comprehensive plan to achieve the new goals established for the division. *Id.* The ultimate restructuring, which remains ongoing, included, *inter alia*, the following reforms:

- Elimination of unnecessary positions through consolidation of positions and duties;

- Restructuring of broker compensation models to provide consistency in pay and foster teamwork between Licensed Bankers and Financial Consultants;[11]

- Implementation of Huntington Team Leader model;

- Establishment of monthly executive summary reporting – sales, operation, compliance;

- Evaluation of vendors/products to establish Preferred Product list;

- Renegotiation of selling agreements with major vendors to improve terms;

- Reorganization and upgrading product and sales training curriculum and quality of training and support provided to Financial Consultants and Licensed Bankers;

- Implementation of on-line trading;

- Creation of a Sales Desk to serve as an immediate resource for Licensed Bankers in all 300-plus Colonial branches;

- Revision of Financial Consultant employment agreements;

- Reduction of office space from three floors to one floor;

- Updating of supervisory procedures;

- Updating Compliance Manual and Business Continuity Plan;

---

[11]    As part of the 2005 restructuring, Colonial re-titled "Financial Consultants" as "Team Leaders", in general recognition of their changed role.  In particular, pursuant to the Team Delivery model, Financial Consultants would be working more closely with Licensed Bankers and employees of the retail side of Colonial Bank as "essential partners" to develop and provide service to customers.

- Creation of a partnership with UVEST Financial Services to provide clearance, settlement and custody services for Colonial customers; and

- Implementation of a rewards/incentive plan for Licensed Bankers and Financial Consultants.

*Id.* In sum, the elimination of positions within the division was only a small part of the comprehensive reforms implemented by Colonial. *Id.*

### 3. THE EXISTING ORGANIZATIONAL STRUCTURE OF THE WEALTH MANAGEMENT DIVISION SIGNIFICANTLY IMPEDED PRODUCTIVITY AND PROFITABILITY.

One immediate challenge Huntington and Colonial recognized was the fact that the existing structure of the division impeded communication and cooperation among its five sections and, in particular, between Licensed Bankers who sold fixed annuities and insurance products under the Family Insurance section, and Financial Consultants who, operating under the Product Management section, sold NASD licensed products, *e.g.*, mutual funds, equities and variable annuities. *Id.* at ¶16. Although part of the same division, the Family Insurance and Product Management sections were essentially operating independently of one another and often were competing directly for the same banking customer. *Id.* Furthermore, there was negligible cooperative effort between the sections of the division and Colonial's retail and commercial banking partners. *Id.* Consequently, Colonial concluded that the organizational structure of the division presented a significant impediment to the goal of increasing and deepening customer relationships and to the ultimate goal of increasing productivity and profitability. In short, there was a complete lack of synergy. *Id.*

To address some of these systemic problems, and specifically to promote greater communication and collaboration among the division's various sections, Huntington recommended adoption of a hybrid investment model known as the Team Delivery model. *Id.* at ¶17. In contrast to the existing structure, which essentially forced each section of the Wealth

Management division to fend for itself, the Team Delivery model was designed to provide a greater focus on the delivery of investment services to customers based on their specific investment needs through the united and cooperative effort of Licensed Bankers, Financial Consultants, retail and commercial banking partners, support staff and product specialists. *Id.* In other words, under the Team Delivery model, the entire apparatus of the division, in conjunction with the complete apparatus of Colonial Bank, would work to create and to further customer relationships and to support and to deliver a total banking solution for customers based on a personalized financial strategy. *Id.*

Implementation of the Team Delivery model directly and significantly affected the Family Insurance and Product Management sections, as well as the existing positions in those sections. *Id.* at ¶18. In particular, as noted above, prior to the implementation of the Team Delivery model in early 2005, the division employed two separate sections to market and to sell traditional investments products and services to customers. *Id.* The Family Insurance section was responsible for selling fixed annuities and insurance products through Licensed Bankers. *Id.* Plaintiff Guy was the Family Insurance Manager, and she directed and supervised Kitty Graham and Terri Meeves, who were the Trainers responsible for providing sales training and product support to the Licensed Bankers with respect to insurance and fixed annuity products. *Id.* However, Plaintiff Guy, as well as Graham and Meeves, had no duties or responsibilities regarding the marketing and sale of NASD licensed products, nor could they perform such duties without the necessary NASD licenses. *Id.*

In contrast, the Product Management section was responsible for providing sales training and product support for Colonial's NASD licensed Financial Consultants (brokers) who, in turn marketed and sold traditional investment and brokerage services, *e.g.*, stocks, bonds, mutual

funds and variable annuities.  *Id.*  The following chart illustrates the relevant section of Wealth Management's organizational structure before implementation of the Team Delivery model.  *Id.*

<u>**WEALTH MANAGEMENT BEFORE 2005 RESTRUCTURING**</u>

4.    **COLONIAL ELIMINATED GUY'S POSITION PURSUANT TO A COMPREHENSIVE RESTRUCTURING OF THE WEALTH MANAGEMENT DIVISION.**

As part of the transition to the Team Delivery model recommended by Huntington, the division chose to consolidate the Family Insurance and Product Management sections.  *Id.* at ¶19.  As part of that consolidation, Linda Green, as the Director of Wealth Management, made the decision to eliminate several positions, including the position of Family Insurance Manager, formerly held by Susan Guy, the two Platform Annuity Agent Trainer positions, formerly held by Kitty Graham and Terri Meeves, and the Product Management position, formerly held by Ann Fuller.  *Id.*  In turn, the division created several new positions that combined the functions of the former Family Insurance and Product Management sections.  *Id.*  Under the new structure, Wealth Management would market all of its investment products within a single section.  *Id.* The division also created the new position of Program Director to oversee the sales training of

Licensed Bankers and NASD licensed Financial Consultants,[12] and it created two Regional Sales and Development Wholesaler positions ("Wholesalers") to train **both** Licensed Bankers selling fixed annuities and insurance products **and** to train Financial Consultants selling NASD licensed investment products.  *Id.*  In other words, there would now be a single section responsible for all investment products.  *Id.*  The following chart illustrates the new organizational structure Colonial adopted and implemented in January 2005.

<u>**WEALTH MANAGEMENT AFTER 2005 RESTRUCTURING**</u>

Colonial eliminated Guy's position based on its good-faith business judgment that the organizational restructuring of the Wealth Management division, in conjunction with many other changes implemented by the division, would best further its goals of increasing efficiency and profitability.  *Id.* at ¶20.  That business judgment was not merely the product of a whim or a reshuffling of the organizational chart, but rather, it was the direct result of a lengthy and introspective process undertaken by Colonial in conjunction with Huntington, a well-respected

---

[12]  The Program Director job also includes the responsibility for developing and coordinating training, sales reporting, sales meetings, marketing, managing relationships with vendors, and managing the sales desk.  *See* Program Director Job Description.  Ex. H.

and independent banking consultant.  *Id.*  At no time did Linda Green or anyone else who participated in the restructuring process consider the age or sex of any employee in eliminating positions during the organizational restructuring.  *Id.*

5.    **COLONIAL INFORMED GUY THAT HER POSITION HAD BEEN ELIMINATED AS PART OF THE ORGANIZATIONAL RESTRUCTURING, BUT THAT SHE COULD REAPPLY FOR OTHER POSITIONS WITHIN THE COMPANY.**

On January 18, 2005, Linda Green, along with Tara Gibson, the Human Resources Area Manager for Colonial's Montgomery Bancgroup, met with Guy in Colonial's Montgomery corporate offices and informed her that Colonial was eliminating her position as part of the organizational restructuring of the Wealth Management division.  *Id.* at ¶21; Affidavit of Tara Gibson ("Gibson Aff."), Ex. C at ¶9.  In fact, Guy concedes in her Complaint and in her affidavit submitted in support of her EEOC Charge of Discrimination that Linda Green informed her that her "job had been eliminated due to a reorganization or restructuring. . . ."  EEOC Charge Affidavit of Susan Guy, Ex. D at ¶15.  *See also* Complaint, Doc. no. 1 ¶9.

At no time during the meeting did Guy ever inquire about the availability of another position within the Wealth Management division or within Colonial Bank.[13]  Green Aff., Ex. A at ¶21; Gibson Aff., Ex. C at ¶9.  However, when Tara Gibson reviewed the terms of the proposed separation agreement with Guy, she informed Guy (as set forth in the Separation

---

[13]  Even if Guy had expressed a general interest in being rehired, it would not be sufficient to establish a prima facie case of age discrimination, particularly because Colonial publicizes its open positions. *Smith v. J. Smith Lanier & Co.*, 352 F.3d 1342, 1345 (11th Cir. 2003) (holding that a dismissed employee's general statement at time of her dismissal that she was willing to take any open position within company, without submitting application for any specific job, did not impose duty on employer to consider her for open positions that it had publicized, and employer's failure to consider employee for such positions was insufficient to establish *prima facie* case of age discrimination under the ADEA); *see also Wanger v. G.A. Gray Co.*, 872 F.2d 142, 145-46 (6th Cir. 1989) (same); *Box v. A&P Tea Co.*, 772 F.2d 1372, 1376 (7th Cir. 1985) (same).  Here, it is undisputed that at the time Colonial notified Guy that her position was being eliminated, Colonial posted job openings on its public internet site.  Gibson Aff., Ex. C at ¶ 8.

Agreement) that she had the right to reapply for another open position within the company.[14]
Gibson Aff., Ex. C at ¶9; Green Aff., Ex. A at ¶21; *see also* January 18, 2005 Separation
Agreement, Ex. J. Linda Green also informed Guy that if she successfully reapplied for another
position, her termination pursuant to the elimination of her Family Insurance Manager position
would not be treated by Colonial as a break in service. Green Aff., Ex. A at ¶21; Gibson Aff.,
Ex. C at ¶9. Although many employees whose positions were eliminated during the
restructuring successfully reapplied for other positions within Colonial, *see* Gibson Aff., Ex. C at
¶11, Guy never reapplied for another position. Gibson Aff., Ex. C at ¶10; Green Aff., Ex. A at
¶21.

  **6.    COLONIAL ELIMINATED NUMEROUS POSITIONS WITHIN WEALTH
        MANAGEMENT AS PART OF ITS COMPREHENSIVE ORGANIZATIONAL
        RESTRUCTURING.**

  Although Plaintiff alleges that Colonial only eliminated positions of women over the age
of 40 during the reorganization, *see* Complaint, Doc. No. 1 at ¶9, the facts are to the contrary.[15]
In particular, as set forth in the affidavits of H.R. Area Manager Tara Gibson and Linda Green,
Executive Vice President of the Wealth Management division, the elimination of the initial four
positions held by Guy, Kitty Graham, Terri Meeves and Ann Fuller were only a small portion of
the total number of positions eliminated during several phases of the organizational restructuring

---

[14]  Although Guy did not accept the separation agreement, the agreement also advised her that she had the right to
reapply for another position at Colonial: "You are eligible to apply for employment with Employer in the future.
You will need to contact the Human Resources Department concerning any interest in available positions and apply
through the normal application process." *See* January 18, 2005 Separation Agreement, Ex. J at ¶11. Furthermore,
Guy would be eligible to reapply for another position within the company even if she rejected the terms of the
proposed separation agreement. Gibson Aff., Ex. C, at ¶6.

[15]  Raw numbers, such as those suggested by Guy, do not and cannot establish a pattern of discrimination. "Such
raw figures are seldom useful because they provide no framework for analysis." *Langston v. Carraway Methodist
Hospitals of Ala.*, 840 F. Supp. 854, 863 (N.D. Ala. 1993). "While statistics are often important in class actions and
disparate impact cases, they 'are of relatively low importance in a case of individual disparate treatment.' " *Id.* at
863 (quoting *Gilty v. Village of Oak Park*, 919 F.2d 1247, 1253 n. 8 (7th Cir. 1990)). "Raw unadorned figures"
cannot and do not support a *prima facie* disparate treatment claim in this case. *Id*; *see also Davidson v. Quorum
Health Group, Inc.*, 1 F. Supp. 2d 1321, 1325 (N.D. Ala. 1997). Furthermore, for an employee to establish a *prima
facie* ADEA case based solely on statistics, the statistics must show a stark pattern of discrimination unexplainable
on grounds other than age. Age Discrimination in Employment Act of 1967, § 2, *et seq.*, 29 U.S.C.A. § 621, *et seq.*

of the Wealth Management division.  Green Aff., Ex. A at ¶22; Gibson Aff., Ex. C at ¶11.  In particular, Colonial eliminated 29 positions as a part of the organizational restructuring of the division, including six positions held by male employees.  Green Aff., Ex. A at ¶22; Gibson Aff., Ex. C at ¶11.  Twenty-one of those positions were held by employees under the age of 40, and 17 of those 21 positions were held by employees under the age of 30.  Green Aff., Ex. A at ¶22; Gibson Aff., Ex. C at ¶11.  Furthermore, the positions eliminated were not limited to the Family Insurance section, but rather, extended to virtually every section of the division, including Operations, Compliance, Program Area and Trust.  Green Aff., Ex. A at ¶22; Gibson Aff., Ex. C at ¶11.

The following chart reflects the specific positions eliminated during the organizational restructuring:

| No. | Position | Name | Date Eliminated | Sex | Age |
|-----|----------|------|-----------------|-----|-----|
| 1. | Regional Sales Director | Richard C. Peterson[16] | 08/31/04 | M | 40 |
| 2. | Regional Platform Annuity Trainer | Terri Meeves | 01/18/06 | F | 43 |
| 3. | Family Insurance Director | Susan Guy | 01/18/05 | F | 44 |
| 4. | Project Manager | Anne Fuller | 01/18/05 | F | 56 |
| 5. | Regional Platform Annuity Trainer | Kitty Graham | 01/18/05 | F | 57 |
| 6. | Senior Business Analyst | Paul Moyes | 07/21/05 | M | 30 |
| 7. | Wealth Management Auditor | Crystal L. Yon | 09/16/05 | F | 27 |
| 8. | Brokerage Compliance Officer II | Jessica A. Ferguson | 09/16/05 | F | 30 |
| 9. | Licensing Specialist | Bradley C. Dailey | 09/16/05 | M | 30 |
| 10. | Brokerage Compliance Officer II | Cay Weaver | 09/16/05 | F | 51 |
| 11. | Investment Trading Specialist I | Chad Ary | 09/16/05 | M | 25 |
| 12. | Licensing Specialist | Courtney Murchison | 09/16/05 | F | 23 |
| 13. | Brokerage Compliance Officer II | Janelle McDougald | 09/16/05 | F | 40 |
| 14. | Investment Sales Assistant | Lydia Burkhalter | 09/16/05 | F | 21 |
| 15. | Investment Trading Specialist I | Sam Marshall | 09/16/05 | M | 28 |
| 16. | Administrative Assistant II | Shira Daniel | 09/16/05 | F | 22 |

**POSITIONS ELIMINATED THROUGH 2005/2006 WEALTH MANAGEMENT DIVISION REORGANIZATION**

---

[16]  Although Richard Peterson was terminated for poor performance, his position was eliminated, and his duties were reassigned to two newly-created State Sales Director positions currently held by Kerry Kimmel-Geiger (female) and Andy Rippy (male).

| 17. | Licensing Manager | Nikole Gober | 09/16/05 | F | 26 |
| 18. | Investment Sales Decision | Leslie Black | 09/16/05 | F | 23 |
| 19. | Investment Sales Decision | Thelma Sasha Core | 09/16/05 | F | 43 |
| 20. | Investment Operations Team Leader | Amanda K. Lee | 09/30/05 | F | 26 |
| 21. | Executive Assistant II | Ashley L. Madrid | 09/30/05 | F | 24 |
| 22. | Commission Specialist II | Ashley R. Warren | 09/30/05 | F | 29 |
| 23. | Investment Sales Assistant | Carl DeWayne Morris | 09/30/05 | M | 31 |
| 24. | Investment Sales Assistant | Jennifer Wallace | 09/30/05 | F | 28 |
| 25. | File Clerk I | Lesley Henderson | 09/30/05 | F | 20 |
| 26. | Investment Sales Decision | Cassandra Glenn | 09/30/05 | F | 27 |
| 27. | Financial Relationship Coordinator | Ashley R. Warren | 03/27/06 | F | 29 |
| 28. | Trust Operations Coordinator II | Jamella Files | 05/31/06 | F | 23 |
| 29. | Trust Operations Coordinator I | Franchesca Ross | 05/31/06 | F | 27 |

See Green Aff., Ex. A at Attachment No. 2 thereto; Gibson Aff., Ex. C at ¶11.

In sum, the elimination of Guy's position in the Wealth Management division was not part of a concerted effort to eliminate older female employees. Green Aff., Ex. A at ¶23. Rather, the elimination of her position was part of a comprehensive organizational restructuring which included the elimination of over two dozen positions within various sections of the Wealth Management division, positions that were held by men and women of diverse age groups. Id. Furthermore, of the 29 positions eliminated, 16 employees (55%) successfully reapplied for other positions within Colonial Bank. Id; Gibson Aff., Ex. C at ¶11.

### 7.    GUY WAS NOT QUALIFIED FOR THE NEW PROGRAM DIRECTOR POSITION.

Unlike the Family Insurance Manager, the new Program Director is responsible for duties requiring various NASD licenses and an extensive knowledge of NASD products. In particular, the Program Director is responsible for developing and coordinating sales training and product support for Colonial's NASD licensed Financial Consultants.[17]    Green Aff., Ex. A at ¶24. Consequently, the Program Director is required to hold certain NASD licenses and to be in good standing with the U.S. Securities and Exchange Commission and the National Association of

---

[17]    The actual training is conducted by the two newly-created Regional Sales and Development Wholesalers (Cary Guffey and Tim Lewis).

Securities Dealers.  *Id.*  The job description for the Program Director position explicitly sets forth the NASD licensing requirements:

> **Education and Experience**
>
> Bachelor's degree in Finance, Accounting, Business.  Seven or more years sales or investment experience.  Bank brokerage experience and experience with product providers a plus.  ***Completion of Series 7, 65, 24, and 63 securities examinations***[18]; completion of Life/Health/Disability and Variable Life insurance License; clean CRD—***good standing with NASD and SEC***.

*See* i*d.* at ¶24; Program Director Job Description, Ex. E.

In evaluating Plaintiff Guy's future within Wealth Management, Director Linda Green was faced with the undeniable fact that Guy could not serve as the Program Director because she lacked NASD licensing and had no experience whatsoever regarding the sale and marketing of NASD regulated products.  Green Aff., Ex. A at ¶25.  Furthermore, Ms. Guy had an opportunity to obtain NASD licensing and, in fact, established that aspiration as a personal goal during her 2003 Employee Self Evaluation.  *Id*; *see also* Susan Guy 2003 Employee Self Evaluation, Ex. H.  The division not only encouraged that goal, but Helena Duncan, Executive Vice-President of Colonial Bank, directed her to obtain her Series 7 license.  Green Aff., Ex. A at ¶25.  Nevertheless, Ms. Guy did not follow these directives and never sat for a single NASD licensing exam.  *Id.  Id.*  Obviously, because she was not licensed, Guy lacked the minimum qualifications for the Program Director position.  *Id*.  Consequently, Ms. Green concluded that Guy was not qualified to develop and coordinate a training program for Colonial's licensed Financial Consultants regarding the marketing and to the sale of NASD related products.  *Id.*

---

[18]  A Series 7 license allows an individual to act as a general securities representative.  A Series 24 license allows managers to supervise branch activities.  A Series 63 license allows an individual to solicit sales under state law.  A Series 65 license allows an individual to act as an investment advisor.

**8.    SEAN TESORO WAS QUALIFIED FOR THE NEW PROGRAM DIRECTOR POSITION.**

On or about January 24, 2005, Colonial, *i.e.*, Linda Green), promoted Sean Tesoro internally from the position of Financial Consultant to the new Program Director position.  Green Aff., Ex. A at ¶26; Affidavit of Sean Tesoro ("Tesoro Aff."), Ex. K, at ¶ 12.  At the time of his promotion, Mr. Tesoro was 33 years old.  Green Aff., Ex. A at ¶26; Tesoro Aff., Ex. K, at ¶ 12.  He had obtained a B.A. from Yale University in 1994.  Green Aff., Ex. A at ¶26; Tesoro Aff., Ex. K, at ¶ 4.  After he graduated from Yale, Mr. Tesoro was employed as a regional manager with Putnam Investments from 1994 to 1997.  Green Aff., Ex. A at ¶26; Tesoro Aff., Ex. K, at ¶ 4.  From 1997 through 1998, he served as Chief of Staff for economist Arthur Laffer, founder of Laffer Associates, an economic research and consulting firm that provides investment-research services to institutional asset managers.  Green Aff., Ex. A at ¶26; Tesoro Aff., Ex. K, at ¶ 4.  From 1999 through January 2005, he worked as a regional manager  for various investment companies, including Sun Life Financial, Allstate Financial Distributors, The Travelers, MassMutual Financial Group and, ultimately, as a Financial Consultant (broker) for Colonial, where he was responsible for marketing and selling investment products through the five Colonial branch banks located in his sales territory.  Green Aff., Ex. A at ¶26; Tesoro Aff., Ex. K, at ¶ 4.  As a Colonial Financial Consultant, Mr. Tesoro was also responsible for training the Licensed Bankers operating in his sales territory with respect to the sale of insurance and fixed-rate annuities.  Green Aff., Ex. A at ¶26; Tesoro Aff., Ex. K, at ¶ 5.  In sum, Mr. Tesoro had over 10 years of experience marketing and selling investment products to clients, including insurance, fixed-rate annuities and NASD licensed products.  Green Aff., Ex. A at ¶26; Tesoro Aff., Ex. K, at ¶ 12.

Additionally, at the time he was promoted to the Program Director position, Tesoro had successfully completed the NASD Series 6 Exam (Investment Company and Variable Contracts Products Representative) (1994), the NASD Series 7 Exam (General Securities Registered Representative) (2004), and the NASAA Series 63 Exam (Uniform Securities Exam) (1994). Tesoro Aff., Ex. K, at ¶ 12. Moreover, Tesoro has been licensed by the State of Alabama to sell insurance and fixed annuity products since 2002. *Id.*

Furthermore, a comparison of the qualifications, functions and duties of Tesoro's position as Program Director and Guy's qualifications, functions and duties as Family Insurance Manager illustrates the dramatic differences in the two positions and clearly demonstrates that Colonial did not merely re-title Guy's position and reassign her duties to Tesoro.

| QUALIFICATION, FUNCTION, OR DUTY | SEAN TESORO AS PROGRAM DIRECTOR | SUSAN GUY AS FAMILY INSURANCE MANAGER |
|---|---|---|
| • Holds Insurance License | ✓ | ✓ |
| • Holds NASD License | ✓ | |
| • Good Standing with NASD and SEC | ✓ | |
| • Supervises the Sales Training and Product Support Provided by Regional Sales and Development Wholesalers Regarding the Sale of Insurance, Fixed Annuities and NASD Licensed Products | ✓ | |
| • Creation and implementation of expanded Licensed Banker program and training for Series 6 NASD investment products (mutual funds and variable annuities) | ✓ | |
| • Develop, Design, Market and Implement Wealth Management Growth Initiatives; | ✓ | |
| • Responsible for Sales Reporting, Contest Development and Implementation to Generate Sales Growth | ✓ | |
| • Maintain and Grow Relationships With Product Providers | ✓ | |
| • Negotiating New and Existing Selling Agreements With Product Providers/Vendors, Including Marketing Support or "Basis Point Contracts" | ✓ | |

| | | |
|---|---|---|
| • Coordination of Wealth Management's Partnership With UVEST Financial Services to Provide Clearance, Settlement and Custody Services for Colonial Customers | ✓ | |
| • Coordination of New Sales Incentive Plans for Licensed Bankers and Financial Consultants | ✓ | |
| • Coordination of Communications With Retail Banks | ✓ | ✓ |
| • Direct Supervision Staff of Wealth Management Employees | ✓ | ✓ |

*See* Tesoro Aff., Ex. K at ¶13.

Furthermore, approximately sixty percent (60%) of the Program Director's duties are dedicated to issues involving traditional equity investments, *e.g.*, stocks, bonds, and mutual funds, and approximately thirty to forty percent (30-40) of the duties concern fixed annuities and insurance. *Id.* at ¶14.

In contrast, when Guy held the position of Family Insurance Manager, she lacked NASD licensing; she had no experience whatsoever regarding the sale and marketing of NASD regulated products; and none of her duties concerned marketing and sale of NASD licensed products or supervising training of licensed Financial Consultants. Green Aff., Ex. A at ¶25. In sum, notwithstanding the fact that Mr. Tesoro was age 33 at the time of his promotion to the new Program Director, Ms. Green found that he was qualified for the position and that he was specifically qualified to perform many job duties which Susan Guy never performed as Family Insurance Manager and, in fact, could not perform without the requisite NASD licensing.

D.    GUY'S CHARGE OF DISCRIMINATION

On April 21, 2005, Guy filed a Charge of Discrimination (No. 130-2005-03842) with the Equal Employment Opportunity Commission (the "EEOC" or "Commission"). Charge of Discrimination, Ex. I. An attorney represented and assisted Guy with preparation of the Charge.

*Id.*  In her Charge of Discrimination, Guy alleged that Colonial discriminated against her on the basis of sex and age when it eliminated her position on January 18, 2005, and terminated her employment.  *Id.*

On December 23, 2005, the EEOC mailed Guy's attorney a Dismissal and Notice of Rights letter informing Guy that it was closing the file on her Charge of Discrimination.  *See* December 23, 2005 EEOC Dismissal and Notice of Rights Letter, Ex. F.  According to this Notice, the EEOC determined based on its investigation that it was unable to conclude that the information obtained established a violation of the applicable statutes.  *Id.*  On March 24, 2006, Guy filed the instant action against Colonial Bank, N.A. and The Colonial BancGroup, Inc.  Doc. no. 1.  In her complaint against Colonial Bank, Guy alleges that her termination on January 18, 2005 was the product of gender and age discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, and the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 671, *et seq.*  Doc. no. 1.  In particular, Guy alleges that the elimination of her position was a pretext to conceal her discriminatory termination by Colonial; that Colonial merely re-titled her position and assigned her same job duties to a younger male employee – Sean Tesoro (age 33).  *Id.* at ¶ 9.

On April 18, 2006, Colonial answered Guy's Complaint, wherein it denied the material allegations therein and asserted various affirmative defenses thereto.  Doc. no. 4.

## IV.    ARGUMENT

### A.    GUY HAS FAILED TO ESTABLISH A *PRIMA FACIE* CASE FOR DISCRIMINATORY DISCHARGE UNDER THE ADEA.

As previously established, in support of her Title VII and ADEA claims, Guy alleges, in essence, that Colonial did not eliminate her position, but rather, merely re-titled her position and assigned all of her duties to Sean Tesoro, a younger-male employee who Colonial promoted to

the newly-created Program Director position in January 2005. Complaint, Doc. no. 1 at ¶ 9. Guy does not, however, claim that she subsequently applied for or was denied another position with Colonial, although she appears to imply that she would have been appointed to the new Program Director position in the absence of age discrimination. Regardless of the basis of her claim, Colonial is entitled to summary judgment because Guy cannot make out a *prima facie* case. Furthermore, assuming *arguendo* that Guy could make out a *prima facie* case, she cannot create a triable issue with respect to Colonial's legitimate, non-discriminatory reason for terminating her employment in January 2005.

1.    **ADEA *PRIMA FACIE* CASE.**

The ADEA makes it unlawful for an employer to discharge any individual because of age. 29 U.S.C. § 623(a); *see also Stubblefield v. Trinity Indus., Inc.*, 961 F. Supp. 1553, 1555-56 (M.D. Ala. 1997). There are three means by which a plaintiff may seek to establish a *prima facie* case of age discrimination: by direct evidence of discriminatory intent, by meeting the test developed by the United States Supreme Court in the context of Title VII cases, or by proof of a statistical pattern of discrimination. *See Verbraeken v. Westinghouse Elec. Corp.*, 881 F.2d 1041, 1045 (11th Cir. 1989), *cert dismissed*, 493 U.S. 1064 (1990); *Stubblefield*, 961 F. Supp. at 1555-56. In the instant case, Guy has provided no direct evidence of discrimination, nor any statistical evidence, but rather seeks to prove a *prima facie* age case of discrimination by offering circumstantial evidence of discrimination. In particular, she points to the elimination of several positions within Wealth Management and the subsequent promotion of younger males to newly created positions formerly held by women over 40 years of age.

When the plaintiff seeks to prove intentional discrimination on the basis of age by using circumstantial evidence of intent, the court applies the framework first set out by the United

States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this framework, the plaintiff must establish a *prima facie* case of discrimination. *Id.* at 802. After the plaintiff has established a *prima facie* case of discrimination, the burden of production is placed upon the employer to articulate a legitimate nondiscriminatory reason for its employment action. *Texas Dept. of Cmty. Affairs v. Burdine,* 450 U.S. 248, 254 (1981). The plaintiff may seek to demonstrate that the proffered reason was not the true reason for the employment decision "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.* at 256; *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997), *cert denied*, 522 U.S. 1045 (1998). A plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000).

The Eleventh Circuit has adopted a variation of the test articulated by the Supreme Court for Title VII claims in *McDonnell Douglas* for cases arising under the ADEA. *See Mitchell v. Worldwide Underwriters Ins. Co.*, 967 F.2d 565, 566 (11th Cir. 1992); *Jameson*, 75 F.3d at 1531. In order to make out a *prima facie* case for an ADEA violation, the plaintiff must show that she (1) was a member of the protected group of persons between the ages of forty and seventy, (2) was subject to adverse employment action, (3) was replaced with a person outside the protected group, and (4) was qualified to do the job. *See Verbraeken v. Westinghouse Elec. Corp.*, 881 F.2d 1041, 1045 (11th Cir. 1989), *cert. dismissed*, 493 U.S. 1064 (1990). The purpose of the *prima facie* case is to show an adverse employment decision that resulted from a discriminatory motive. *See Perryman v. Johnson Prods. Co.*, 698 F.2d 1138, 1143 (11th Cir. 1983).

These criteria are altered in both a reduction-in-force (RIF) case and when a position is eliminated in its entirety; in these instances, a plaintiff must demonstrate (1) that she was in a protected age group and was adversely affected by an employment decision, (2) that she was qualified for her current position or to assume another position at the time of discharge, and (3) evidence by which a fact finder could reasonably conclude that the employer intended to discriminate on the basis of age in reaching that decision. *See Rowell v. Bellsouth Corp.*, 433 F.3d 794, 798 (11th Cir. 2005); *Smith v. J. Smith Lanier & Co.*, 352 F.3d 1342, 1344 (11th Cir. 2003); *Jameson*, 75 F.3d at 1531-32.[19]   As noted by one Circuit Court of Appeals, "a plaintiff whose employment position is eliminated in a corporate reorganization or workforce reduction carries a heavier burden in supporting charges of discrimination than does an employee discharged for other reasons." *Wilson v. Firestone Tire & Rubber*, 932 F.2d 510, 517 (6th Cir. 1991); *see also Ridenour v. Lawson Co.*, 791 F.2d 52, 57 (6th Cir. 1986).   "As long as employers do not act with discriminatory intent, they may eliminate positions in the name of economic necessity or efficiency, even when those positions are held by more senior workers." *Wilson v. Firestone Tire & Rubber,* 932 F.2d 510, 517 (6th Cir. 1991); *see also Armendariz v. Pinkerton Tobacco Co.*, 58 F.3d 144, 152 (5th Cir. 1995), *cert. denied*, 116 S. Ct. 709 (1996) ("[T]he ADEA does not require that an employer prove that it is in fact losing money before it can take a nondiscriminatory and legitimate course of action to make more.")

### 2.    GUY CANNOT ESTABLISH A *PRIMA FACIE* CASE UNDER THE ADEA.

In considering the basis of Guy's ADEA claim, it is important to note that the ADEA "does not mandate that employers establish an interdepartmental transfer program during the course of a RIF, . . . or impose any added burden on employers to transfer or rehire laid-off

---

[19]   The third element is particularly important because, unlike some Circuit Courts of Appeal, the Eleventh Circuit requires the plaintiff to produce evidence that the employer intended to discriminate.  *See Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1329 (11th Cir. 1998).

workers in the protected age group as a matter of course." *Jameson*, 75 F.3d at 1532-33 (citations omitted); *see also Smith*, 352 F.3d 1342, 1344-45 (11th Cir. 2003) (citing *Arrow*). Rather, the ADEA simply provides that a discharged employee "who applies for a job for which she is qualified and which is available at the time of her termination must be considered for that job along with all other candidates, and cannot be denied the position based upon her age." *Arrow*, 75 F.3d at 1533; *see also Smith*, 352 F.3d at 1344-45.

In the instant case, although Guy's complaint is no model of clarity, in construing every allegation in her favor, there are only two possible (and related) adverse employment actions which Guy could assert as the basis of her *prima facie* case. First, as appears most likely from the face of her complaint, Guy alleges that Colonial did not eliminate her Family Insurance Manager position in January 2005, but rather, merely re-titled her job, terminated her employment, and assigned her duties to a younger male employee – Sean Tesoro (age 33). Doc. no. 1 at ¶9. Thus, Guy contends that her termination and Colonial's subsequent failure to promote her to the newly-created Program Director position constitute adverse and discriminatory employment actions based on her age. Regardless of whether Guy clearly articulated either action as a basis of her claims, they do not support her ADEA claim.

With respect to the first element of her *prima facie* case, Colonial does not dispute that Guy is within a protected group (female over 40 years of age) and was adversely affected by the elimination of her position as Family Insurance Manager. As to the second *prima facie* requirement, although Guy was qualified for her Manager position, which was eliminated during the restructuring of Wealth Management, qualification for her current position is not sufficient to establish her *prima facie* case. Rather, "[w]here a particular job position is entirely eliminated for nondiscriminatory reasons, for a plaintiff to prevail against h[er] employer [s]he must show

that [s]he was qualified for another available job with that employer; qualification for h[er] current position is not enough." *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1082-83 (11th Cir. 1990) (citations omitted); *see also Edwards v. Baptist Health*, No. Civ. A. 204CV561AWO, 2005 WL 1331262, *4 (M.D. Ala. 2005); Barnes *v. Southwest Forest Indus., Inc.*, 814 f.2d 607, 609 (11th Cir. 1987). Thus, absent a showing that there was an open position for which Guy was qualified at the time of her discharge, she cannot establish the second prong of her *prima facie* case. *See Earley*, 907 F.2d at 1083 n. 4 (holding that "[i]f plaintiffs need prove only that they were qualified for some available position at any earlier or later time, virtually every plaintiff would be able to meet this requirement of a *prima facie* case."). As will be discussed below, although Guy does not specifically allege that she either sought or was qualified for an open position at the time of her termination, based on the totality of her Complaint, it is reasonable to assume that she claims that she was qualified for the newly-created position of Program Director to which Sean Tesoro was promoted in January 2005.

Assuming that Guy's claim is based on the alleged failure of Colonial to appoint (or promote) her to the newly-created Program Director position, Guy still cannot establish the second element of her *prima facie* case because the evidence compellingly establishes that she was ***not*** qualified for the position and that her qualifications, relative to those of Sean Tesoro, do not establish that there were any open positions for which Guy was qualified. Furthermore, to the extent Guy claims that her position was not eliminated, but instead that her job duties were merely assumed by Mr. Tesoro, the evidence clearly refutes that naked allegation.

### a. COLONIAL ELIMINATED GUY'S POSITION, AND HER FORMER DUTIES WERE SUBSUMED WITHIN AN ENTIRELY NEW POSITION.

As established above, Sean. Tesoro did not merely replace Guy and assume her Family Insurance Manager duties. Although Mr. Tesoro has assumed some of Guy's former duties

related to insurance and fixed-rate annuity products, those duties comprise only a portion of the more expansive Program Director position; that the new Program Director position includes significant and substantial duties never performed by Guy as the Family Insurance Manager. Unlike the Family Insurance Manager, the new Program Director is responsible for duties requiring various NASD licenses and an extensive knowledge of NASD product, including the following: (1) developing and coordinating sales training and product support for Colonial's NASD licensed Financial Consultants; (2) negotiating new and existing selling agreements with product providers/vendors; and (3) coordinating Wealth Management's partnership with UVEST Financial Services to provide clearance, settlement and custody services for Colonial customers. Tesoro Aff., Ex. K at ¶13. Each of these duties requires the Program Director to hold several NASD licenses and to possess a working knowledge of NASD licensed products. In fact, as established in Mr. Tesoro's affidavit, approximately sixty percent (60%) of his duties as Program Director are dedicated to issues involving traditional equity investments, *e.g.*, stocks, bonds, mutual funds and variable annuities. Tesoro Aff., Ex. K at ¶14. In her position as Family Insurance Manager, Guy was never responsible for developing or implementing training and support regarding NASD licensed products or for coordinating and negotiating selling agreements for NASD licensed products. Rather, her duties were limited in scope to insurance and fixed-rate annuities. In other words, if Colonial had appointed Guy to the Program Director position, she would not be able to perform many of the essential functions of the position.

In sum, Guy's position no longer exists, and her former responsibilities no longer constitute a single, distinct position. Without more, Guy's unsupported claim that her duties were reassigned to a substantially younger male employee fails to establish a *prima facie* case. *See, e.g.*, *Edwards v. Baptist Health*, No. Civ. A. 204CV561AWO, 2005 WL 1331262, *8 (M.D.

Ala. 2005) (holding that the mere fact that a younger employee assumed some of the plaintiff's former duties, was insufficient to establish a *prima facie* case under the ADEA); *Minton v. Am. Bankers Ins. Group, Inc.*, No. 02-12942, 2003 WL 21303330, *1 (11th Cir. Feb. 6, 2003) (affirming summary judgment for employer on ADEA claim that found employee was not replaced when coworker merely absorbed some of plaintiff's duties); *Stubblefield v. Trinity Indus., Inc.*, 961 F. Supp. 1553, 1558 (M.D. Ala. 1997) (*citing Barnes v. GenCorp. Inc.*, 896 F.2d 1457 (6th Cir.), *cert. denied*, 498 U.S. 878 (1990)) (holding a person is not replaced when another employee is assigned to perform that person's duties in addition to other duties).[20]

### b.    GUY WAS UNQUALIFIED FOR THE PROGRAM DIRECTOR POSITION.

Not only did Guy's former responsibilities no longer constitute a single, distinct position, but also, even if she had applied or otherwise requested appointment to the Program Director position, she was not minimally qualified for the job because she did not hold the requisite NASD licenses or have any experience selling NASD licensed products.  As previously explained, when the Wealth Management division eliminated the Family Insurance Manger position in January 2005, it reassigned the functions of that position to the newly created Program Director position.  However, in addition to developing and implementing training and support for Licensed Bankers *vis-à-vis* the sale of insurance and fixed annuities.  The Program Director explicitly sets forth the NASD licensing requirements and the duties regarding the development and coordination of training related to Wealth Management, including training of

---

[20]  *See also Brown v. McLean*, 159 F.3d 898, 903 (4th Cir. 1998) (noting that the "new" position, in failure to hire or promote action filed under Title VII, "encompassed duties that had not been part of the [previous] position that [plaintiff] had held"); *Vaughan v. Metrahealth Cos., Inc.*, 145 F.3d 197, 294 (4th Cir. 1998) (shifting and consolidating work does not constitute "replacement" for purpose of the ADEA); *see also Furr v. Seagate Tech., Inc.*, 82 F.3d 980, 988 (10th Cir. 1996) (stating that "the test for position elimination is not whether the responsibilities were still performed, but rather whether the responsibilities still constituted a single, distinct position"); *Collier v. Budd Co.*, 66 F.3d 886, 890 n.5 (7th Cir. 1995) (holding that shifting and/or consolidating work does not constitute replacement); *Bialas v. Greyhound Lines, Inc.*, 59 F.3d 759, 763 (8th Cir. 1995) (during reduction in force, fact that plaintiff's duties were assumed by younger person is not in itself enough to establish *prima facie* case under ADEA).

Colonial's NASD licensed Financial Consultants. Program Director Job Description, Ex. E. It is undisputed, however, that at the time Colonial eliminated Guy's position and terminated her employment, she did not possess the required NASD licenses; she had no existing relationship with the National Association of Securities Dealers or the Securities and Exchange Commission; and she had no experience selling NASD licensed products. Therefore, Guy cannot establish her *prima facie* case because she was not qualified to perform the essential duties of the Program Director position. As stated by the Eleventh Circuit, "[t]his Court repeatedly has stated that it will not second-guess a company's legitimate assessment of whether an employee is qualified for a particular position." *Steger v. General Elec. Co.*, 318 F.3d 1066, 1076 (11th Cir. 2003). *See also Baker v. Sears, Roebuck, & Co.*, 903 F.2d 1515, 1520-21 (11th Cir. 1990) (per curiam) (ruling that ADEA plaintiff was not qualified for her position and thus did not establish a prima facie case). Additionally, the mere fact that Guy previously expressed a desire to obtain a license is not sufficient to qualify her for the position. *See Walker v. Prudential Property and Cas. Ins. Co.*, 286 F.3d 1270, 1276-77, n.6 (11th Cir. 2002) (holding that the mere fact that the plaintiff expressed an interest in obtaining a license to become a licensed claims representative did not qualify her for the position for purposes of the ADEA). Thus, assuming that the basis of her ADEA claim is that she should have been considered or promoted to the Program Director position, her claim fails because Guy was unqualified for the position.

In contrast, the candidate ultimately selected for the new position, Sean Tesoro, was fully qualified for the new Program Director position and, in fact, possessed qualifications superior to those of Guy. At the time he was promoted, Tesoro held a B.A. from Yale University; he held an insurance license and several NASD licenses (Series 6, 7, and 63); and he had over 10 years

of experience marketing and selling investment products to clients, including insurance, fixed-rate annuities and NASD licensed products.  Tesoro Aff., Ex. K at ¶¶4, 12.

In sum, to the extent that Guy claims that she, rather than Tesoro, should have been appointed to the new Program director position, the evidence shows that Guy simply was not qualified for the position, and her subjective opinion and conclusory allegations that she was at least or more qualified than Tesoro are insufficient to withstand summary judgment.  *See Holifeld v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997) (stating that "conclusory assertions . . . in the absence of supporting evidence are insufficient to withstand summary judgment.").[21]

**3.    GUY HAS FAILED TO ESTABLISH THE THIRD ELEMENT OF HER *PRIMA FACIE* CASE BECAUSE THERE IS NO EVIDENCE BY WHICH A FACT FINDER COULD REASONABLY CONCLUDE THAT COLONIAL INTENDED TO DISCRIMINATE ON THE BASIS OF AGE.**

Guy has also failed to establish the third element of her *prima facie* case because she cannot offer any substantially probative evidence that age more likely than not motivated Colonial's decision either to eliminate her position or to appoint Tesoro rather than her to the Program Director position.  As recently stated by the Eleventh Circuit, to establish intent the plaintiff must proffer evidence that could lead a factfinder to conclude that " '(1) [the] defendant consciously refused to consider retaining a plaintiff because of his age, or (2) [the] defendant regarded age as a negative factor in such consideration.' "  *Jones v. BE&K Engineering Co.*, 146 Fed. Appx. 356, 359, 2005 WL 1995425 (11th Cir. 2005) (quoting *Allison v. Western Union Tel. Co.*, 680 F.2d 1318, 1321 (11th Cir. 1982)).  Furthermore, Guy's personal belief that she was more qualified than Tesoro for the Program Director position is not sufficient to demonstrate

---

[21]  To the extent that Guy may now claim that she was qualified for other open Colonial positions at the time of her termination, there is no evidence that she ever applied for any other available position or that she otherwise made known her desire to be appointed to any specific position.  The Eleventh Circuit law on this issue is well-settled – the plaintiff must not only be qualified for an open position, but she must also apply for the position in order to satisfy the second element of her *prima facie* case under the ADEA.  A plaintiff's expression of general interest in a position or in continued employment with the company is insufficient to establish a *prima facie* case.  *See Smith v. J. Smith Lanier & Co.*, 352 F.3d 1342 (11th Cir. 2003).

discriminatory intent. *See, e.g., Rowell v. Bellsouth Corp.*, 433 F.3d 794, 799 (11th Cir. 2005). Neither has Guy shown (or even alleged) that anyone at Colonial, let alone a decisionmaker involved in her discharge, made any age-biased comments to her which would tend to show that Colonial's legitimate reason for her termination was pretextual. Guy's burden is made all the more difficult by the fact that *the* major decision maker, Linda Green, is a member of the protected class (female over 40 years old). In fact, not only is Linda Green a member of the same protected class, but also, there are numerous female employees who occupy high-level positions in Colonial, including Sarah Moore (age 40), Chief Financial Officer, Patti Hill (age 48), Chief Operating Office, Caryn Cope (age 42), Chief Credit Officer, Michelle Condon (age 52), Executive Vice President of Special Projects, and Rudi Thompson (age 44), Corporate Human Resources Director. Gibson Aff, Ex. C at ¶14. The Eleventh Circuit has been reluctant to find discriminatory intent under the ADEA when the decision maker is a member of the protected class. *See, e.g. Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1471 (11th Cir. 1991) (reversing age discrimination jury verdict for plaintiff: [Plaintiff] faces a difficult burden here, because all of the primary players behind his termination . . . were well over age forty and within the class of persons protected by the ADEA.").[22]

Furthermore, of the 29 positions eliminated through the reorganization of the Wealth Management division, 21 were held by employees under the age of 40, and 16 of those 21 employees (including five men) were under the age of 30. All of these undisputed facts undermine Guy's suggestion that Colonial adopted a strategy to eliminate older women from the Wealth Management division. In sum, there is no evidence from which a fact finder could

---

[22] *See also Fairchild v. Forma Scientific, Inc.*, 147 F.3d 567, 572 (7th Cir. 1998) ("While persons of any age are capable of age discrimination, that the decisionmaker is older than the terminated employee is certainly significant in evaluating the evidence of discrimination."); *Richter v. Hook-SuperRx, Inc.*, 142 F.3d 1024, 1032 (7th Cir. 1998) (while not dispositive, it is significant that decisionmakers were members of protected class).

reasonably conclude that Colonial intended to discriminate against Guy on the basis of her age or sex.

### 4. GUY CANNOT ESTABLISH THAT COLONIAL'S REORGANIZATION WAS A MERE PRETEXT FOR DISCRIMINATION ON THE BASIS OF AGE.

Even assuming *arguendo* that Guy has established a *prima facie* case, Colonial has clearly established legitimate nondiscriminatory reasons for each decision. First, with respect to the elimination of Guy's Family Insurance Manager position, Colonial eliminated the position as part of a comprehensive reorganization to increase revenues and profitability of the Wealth Management division. Second, Colonial has proffered three legitimate, nondiscriminatory reasons for appointing Sean Tesoro rather than Guy to the Program Director position: (1) Guy was not qualified for the job because she lacked the NASD licenses and experience necessary to develop and coordinate sales training and product support for Colonial's NASD licensed Financial Consultants; (2) Sean Tesoro was more qualified for the position; and (3) Wealth Management was unprofitable due, in part, to the poor performance of the Family Insurance section managed by Guy.[23]

Guy bears the weighty burden of rebutting ***each*** of Colonial's proffered legitimate reasons for its actions. *See Lesch v. Crown & Cork Seal Co.*, 282 F.3d 467, 473 (7th Cir. 2002) ("Where an employer offers multiple independently sufficient justifications for an adverse employment action, the plaintiff employee must cast doubt on each of them.") Indeed, an articulated reason "cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reasons were false, and that discrimination was the real reason." *St Mary's Honor Ctr. v.*

---

[23] Once the plaintiff establishes her *prima facie* case, the employer then must offer a legitimate, non-discriminatory reason for the employment action. *See Mitchell v. USBI Co.*, 186 F.3d 1352, 1354 (11th Cir. 1999); *Maddow v. Procter & Gamble Co., Inc.*, 107 F.3d 846, 851 (11th Cir. 1997). However, the employer's "burden is production not persuasion. . . . The ultimate burden of persuasion remains at all times with plaintiff." *Eastland v. Tennessee Valley Auth.*, 704 F.2d 613, 619 (11th Cir.), *modified in part on reh'g on other grounds*, 714 F.2d 1066 (11th Cir.), *cert. denied*, 465 U.S. 1066 (1983).

*Hicks*, 509 U.S. 502, 515-16 (1993).   To rebut Colonial's proffered reasons, Guy must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find [all of those reasons] unworthy of credence." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997) (internal quotation marks and citation omitted), *cert. denied*, 118 S. Ct. 685 (1998); *see also Watkins v. Sverdrup Technology Inc.,* 153 F.3d 1308, 1314 (11th Cir. 1998). "Conclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext or intentional discrimination where [an employer] has offered . . . extensive evidence of legitimate, non-discriminatory reasons for its actions." *Isenbergh v. Knight-Ridder Newspaper Sales, Inc.*, 97 F.3d 436, 443-44 (11th Cir. 1996) (*quoting Young v. General Foods Corp.*, 840 F.2d 825, 830 (11th Cir. 1988)) (quoting *Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 597 (11th Cir. 1987)).   Accordingly, because Colonial has articulated legitimate nondiscriminatory reasons, it is Plaintiff's burden to present evidence that ***each*** reason is false and is a pretext for age discrimination.

> a.    GUY CANNOT REBUT COLONIAL'S LEGITIMATE, NONDISCRIMINATORY REASON FOR ELIMINATING GUY'S POSITION.

Guy can offer no admissible evidence that would tend to show that Colonial's nondiscriminatory reason why it chose to eliminate her Family Insurance Manager position was merely a pretext to discharge her on the basis of her age.   First, as previously discussed, Colonial's Wealth Management division underwent a comprehensive restructuring in 2004 to improve its customer relationship and to increase its efficiency, productivity and profitability.   In order to effectuate its reorganization, Colonial made a rational business decision to eliminate a variety of positions, including the Family Insurance Manager position, and to combine certain areas of its operations.   Guy cannot offer any evidence challenging the validity of the

reorganization as the basis for eliminating her job. Furthermore, notwithstanding Guy's allegations, there is no evidence that Colonial merely switched job titles as a ruse to discharge Guy and to replace her with a younger male. Rather, her duties were merely reassigned and absorbed into the new Product Manager position which included significant duties not previously performed by Guy as Family Insurance Manager, *e.g.*, developing and coordinate sales and training support for NASD licensed Financial consultants and negotiating new and existing selling agreements with Colonial's NASD licensed Financial Consultants.

Additionally, it stretches the bounds of credulity to believe that Colonial would restructure its entire Wealth Management division in an effort to mask its true intent to fire Guy because of her age. A lack of discriminatory intent is further evidenced by the fact that Colonial retained a reputable, outside banking consultant to prepare the Wealth Management restructuring plan and to develop a series of goals and strategies to increase revenues and profitability for the section. Thus, in order for the Court to conclude that Colonial's articulated reason was false, it would have to conclude that Huntington and Colonial conspired to restructure the entire division for the purpose of eliminating Guy's position and discharging her on the basis of her age. Clearly, that would be an exceedingly improbable plot, and certainly one not supported by the evidence, particularly given the fact that 21 of the 29 positions eliminated during the restructuring were held by employees under the age of 40 and 17 of those 21 positions were held by employees under the age of 30. Gibson Aff., Ex. C, at ¶11. As held by the Eleventh Circuit, the plaintiff's burden is to "present concrete evidence in the form of specific facts which show that the defendant's proffered reason is mere pretext," and "[m]ere conclusory allegations and assertions will not suffice." *Earley v. Champion Intern. Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990). In the present case, Guy's theory is not substantiated by concrete evidence or specific

facts from which a fact finder might reasonably conclude that Colonial intended to discriminate on the basis of age.

Finally, it is well-settled law that a company may alter or upgrade the responsibilities of its employees, and that courts "do not sit to second-guess the business judgment of employers." *Combs*, 106 F.3d at 1543. *See also Chapman v. AI Transport*, 229 F.3d 1012 (11th Cir. 2000) ("A plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute his business judgment for that of the employer."); *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991) ([f]ederal courts "do not sit as a super-personnel department that reexamines an entity's business decisions. No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, the ADEA does not interfere. Rather our inquiry is limited to whether the employer gave an honest explanation of its behavior.") (internal citations omitted)); *Ashe v. Aronov Homes, Inc.*, 354 F. Supp. 2d 1251, 1260 (M.D. Ala. 2004) (same); *Lamb v. Runyon*, 915 F. Supp. 300, 307 (M.D. Ala. 1995) (noting that the Court does not sit as a super-personnel department or determine whether the employer exercised prudent business judgment).[24]

In sum, no reasonable jury could find that Colonial's elimination of Guy's position was anything other than a business decision, and the ADEA is not a vehicle for reviewing the propriety of business decisions. *Watkins,* 153 F.3d at 1317.

---

[24] *See also Beaver v. Rayonier, Inc.*, 200 F.3d 723, 728 (11th Cir. 1999) (holding that an "employer is free to choose whatever means it wants, so long as it is not discriminatory, in responding to bad economic conditions."); *Tarshis v. Riese Org.*, 211 F.3d 30, 37 (2d Cir. 2000) ("We recognize that a reduction-in-force or restructuring that results in an elimination of jobs often is a legitimate reason for dismissing an employee."), *abrogated on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002); *Washington v. Board of Pub. Utils.*, 939 F.2d 901, 903 (10th Cir. 1991) (affirming a grant of summary judgment to a defendant where the plaintiff produced "no evidentiary matter even suggesting that [defendant's] business decision [to reclassify a position and subsequently phase out a department] was a pretext for the purpose of discriminating against plaintiff").

b.    GUY CANNOT REBUT COLONIAL'S LEGITIMATE, NONDISCRIMINATORY REASON FOR APPOINTING SEAN TESORO TO THE PRODUCT MANAGER POSITION.

As previously stated, Colonial has proffered three independent, legitimate and nondiscriminatory reasons for appointing Sean Tesoro rather than Guy to the newly created Program Director position: (1) Guy was not qualified for the job because she lacked the NASD licenses and experience necessary to develop and coordinate sales training and product support for Colonial's NASD licensed Financial Consultants; (2) Sean Tesoro was more qualified for the position; and (3) Wealth Management was unprofitable due, in part, to the poor performance of the Family Insurance section managed by Guy.

With respect to the issue of qualifications, the facts are undisputed: Guy lacked both the essential NASD licenses and the experience necessary to develop and coordinate sales training and product support for Colonial's NASD licensed Financial Consultants. Therefore, Guy could not perform many essential functions of the Program Director position. Second, Colonial appointed Sean Tesoro to the new Program Director position based on its business judgment that he was more qualified for the position than Guy particularly because he held an insurance license and several NASD licenses (Series 6, 7, and 63) and had over 10 years of experience marketing and selling investment products to clients, including insurance, fixed-rate annuities and NASD licensed products. Tesoro Aff., Ex. K at ¶¶4, 12. In contrast, Guy did not hold any NASD licenses and had no experience whatsoever selling NASD licensed products.[25]

Third, the undisputed evidence clearly supports the need for restructuring. Wealth Management was consistently underperforming when compared to reliable industry benchmarks

---

[25]    Of course, Guy's failure to meet the minimum qualifications of the new Program Director position also undermine her *prima facie* case given the fact that she must establish that she was at least qualified for the position and as qualified as the person ultimately appointed to the position. In fact, as previously noted, Guy must show that she was so much more qualified that the disparity virtually jumps off the page and slaps one in the face. *Walker v. Prudential Property and Cas. Ins. Co.*, 286 F.3d 1270, 1277 (11th Cir. 2002).

and Colonial's internal standards.  Although Colonial does not place total responsibility for the underperformance of the Family Insurance section on Guy[26], the fact remains that she was the Manager of the section and was responsible for increasing "gross sales and fee income in the platform program."  *See* Family Insurance Manager Job Description.  Ex. G.  Thus, it was Colonial's good faith belief that Guy simply was not performing her job at a level that met Colonial's legitimate expectations.  Such a good-faith belief clearly constitutes a legitimate nondiscriminatory reason for termination.  *See Chapman v. AI Transport*, 229 F.3d 1012, 1033 (11th Cir. 2000) (en banc) (holding that the defendant's subjective reason for an employment action "is a legally sufficient, legitimate, nondiscriminatory reason if the defendant articulates a clear and reasonable specific factual basis upon which it based its subjective opinion"); *see also Clark v. Coats & Clark Inc.*, 990 F.2d 1217, 1228 (11th Cir. 1993) ("An employer's good faith belief that an employee's performance is unsatisfactory constitutes a legitimate nondiscriminatory reason for termination").

In sum, no matter what Graham may argue, she cannot establish such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in Colonial's proffered legitimate reasons for its action that a reasonable factfinder could find any or all of the three reasons unworthy of credence.  The evidence simply does not show that Colonial acted in a discriminatory manner by eliminating her position or by appointing Sean Tesoro rather than Guy to the new Program Director position.  Therefore, even assuming *arguendo* that Graham established a *prima face* case under the ADEA, she cannot establish pretext.

---

[26] Colonial understands that deteriorating market conditions also plays a role in the overall decline in sales of fixed annuities.

**5.    EVEN IF GUY COULD ESTABLISH AN ILLEGAL MOTIVE, COLONIAL'S DECISIONS TO ELIMINATE GUY'S POSITION AND TO PROMOTE SEAN TESORO TO THE PROGRAM DIRECTOR POSITION WOULD BE THE SAME.**

Finally, assuming *arguendo* that Guy could establish that Colonial's decisions to eliminate her position or to promote Sean Tesoro to the Program Director position were motivated in part by her age, Colonial would have made the same decisions even if there had been no motive to discriminate against Guy on the basis of her age.  It is well-settled that "[w]hen the employee has shown that the employment decision was based on an illegal motive, the employer may avoid liability by proving by the preponderance of the evidence that the decision would have been made in the absence of discrimination."[27]  *Steger v. General Elec. Co.*, 318 F.3d 1066, 1075 (11th Cir. 2003) (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 252-53, 258 (1989)); *see also Pennington v. City of Huntsville*, 261 F.3d 1262, 1269 (11th Cir. 2001). The employer's evidence "must show that its legitimate reason, standing alone, would have induced it to make the same decision." *Price Waterhouse*, 490 U.S. at 252; *Steger,* 318 F.3d at 1075.  As clearly established by the Eleventh Circuit, a "same decision" defense can be sufficiently supported by evidence showing . . . a competing job candidate's better qualifications, *Harris v. Shelby Co. Bd. of Educ.*, 99 F.3d 1078, 1084 (11th Cir. 1996). . . ." *Steger,* 318 F.3d at 1076.

In the instant case, there are three independent reasons supporting Colonial's "same decision" defense with respect to Colonial's decision to promote Sean Tesoro rather than Guy to the new Program Director position.  Guy lacked NASD licensing and experience necessary to develop and coordinate a sales training program for Colonial's licensed Financial Consultants and was not performing her job at a level that met Colonial's legitimate and reasonable

---

[27]  The Civil Rights Act of 1991 limited application of the mixed-motive defense in discrimination cases based on race, color, religion, sex and national origin, but left the defense intact for retaliation cases and actions based on age discrimination.  *Lewis v. Young Men's Christian Ass'n*, 208 F.3d 1303, 1305 (11th Cir. 2000).

expectations. Tesoro, in contrast, held several NASD licenses and had 10 years of experience selling NASD licensed products. Each of these factors, none of which Guy can rebut, compellingly supports Colonial's "same decision" defense.

Second, with respect to Colonial's decision to eliminate Guy's Family Insurance Manager position, as well as several other positions within the Wealth Management division, the undisputed facts establish that Colonial made this good faith business decision based on the assessment of a well-respected third-party banking consultant (Huntington) as part of a comprehensive plan designed to improve the efficiency and profitability of Wealth Management. Again, Guy can offer no evidence to the contrary.

For these additional reasons, and there being no disputed issue of material fact, Colonial is entitled to summary judgment on all of Guy's ADEA claims.

**B.    GUY'S CLAIM THAT COLONIAL VIOLATED TITLE VII BY TERMINATING HER EMPLOYMENT ON THE BASIS OF HER GENDER AND/OR AGE FAILS AS A MATTER OF LAW.**

**1.    GUY CANNOT ESTABLISH A *PRIMA FACIE* CASE UNDER TITLE VII.**

In addition to her ADEA claim, Guy claims that Colonial violated Title VII by discriminating against her on the basis of age and/or gender. Complaint, Doc. No. 1 at ¶¶3, 6. In order for Guy to sustain a *prima facie* case showing of discriminatory discharge on the basis gender under Title VII, Guy must demonstrate that: (1) she belongs to a protected class; (2) she was subjected to an adverse employment action; (3) her employer treated similarly situated employees outside her classification more favorably; and (4) she was qualified to do the job. *See Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1091 (11th Cir. 2004) (internal citations omitted). Although Guy arguably satisfies the first two elements of the required *prima facie* case, she cannot meet either the third or fourth elements and, therefore, her claims against Colonial Bank

fail as a matter of law.  Furthermore, even assuming *arguendo* that Guy could make out a *prima facie* case, she cannot create a triable issue with respect to Colonial's legitimate, non-discriminatory reason for terminating her employment in January 2005.

Guy can present no evidence from which one could conclude that a similarly situated male was treated more favorably than she was treated.  First, as set out above, Sean Tesoro is not similarly situated to Guy.  Unlike Guy, Tesoro possessed qualifications for the Program Director position that were clearly and demonstrably superior to those of Guy, including several NASD licenses and ten years of brokerage experience.  Tesoro Aff., Ex. K at ¶12.  Thus, Guy cannot show that Colonial Bank treated a similarly situated male employee more favorably than she was treated.

Additionally, as set out above, *see* §A(2)(b), *supra*, Guy fails to satisfy the fourth required element of the *prima facie* case because she lacked the requisite experience and NASD licenses necessary to meet the minimum qualifications of the Program Director position.  Furthermore her performance as the Family Insurance Manager failed to meet Colonial's legitimate expectations as reflected by the lackluster performance of the Family Insurance section which she managed.  Thus, it is undisputed that Guy was not qualified for the Program Director position.  Consequently, she fails to meet the fourth and final element of the required *prima face* case for gender discrimination.

Finally, even if Guy could present sufficient evidence to support a *prima facie* case for gender discrimination under Title VII, as previously established, *see* §A(4)(a), *supra*, Guy cannot show that the elimination of her Family Insurance Manager position as part of a comprehensive restructuring of the Wealth Management division was a pretext for discrimination.  Finally, Guy

does not allege that any age or gender biased comments were made to her that would suggest that her termination was pretextual.

For these reasons, Defendant Colonial Bank is entitled to summary judgment on Guy's Title VII gender discrimination claims.

## C.    TO THE EXTENT GUY ALLEGES A FAILURE TO PROMOTE CLAIM ON THE BASIS OF GENDER AND/OR AGE, HER CLAIM FAILS AS A MATTER OF LAW.

### 1.    GUY CANNOT ESTABLISH A *PRIMA FACIE* CASE OF GENDER OR AGE DISCRIMINATION WITH RESPECT TO HER PROMOTION CLAIM.

To the extent that Guy's Complaint could be construed as alleging a separate failure to promote claim based on the fact that Sean Tesoro was promoted to the new Program Director position rather than Guy, she still fails to meet her *prima facie* burden.  In a failure to promote claim, the establishment of a *prima facie* case requires the plaintiff to show (1) that she belongs to the protected group, (2) that she applied for and was qualified for the position for which the employer was seeking applicants, (3) that she was denied the promotion, and (4) that another equally or less qualified individual outside the protected class received the promotion.  *See Denney v. City of Albany*, 247 F.3d 1172, 1183 (11th Cir. 2001).  Furthermore, in a failure to promote case, a plaintiff cannot prove pretext by merely showing that she was better qualified than the individual who received the position that she wanted; rather she must establish that the defendant's employment decisions were in fact motivated by sex (or gender).  *Id.* at 1253.  Mere " 'disparities in qualifications are not enough in and of themselves to demonstrate discriminatory intent unless those disparities are so apparent as virtually to jump off the page and slap you in the face.' "  *Lee*, 226 F.3d at 1254 (quoting *Deines v. Texas Dept. of Protective and Regulatory Servs.*, 164 F.3d 277, 280 (5th Cir. 1999)).  In other words, the "disparities in qualifications must be of such weight and significance that no reasonable person, in the exercise of impartial

judgment, could have chosen the candidate selected over the plaintiff for the job in question."
*Cooper v. Southern Co.*, 390 F.3d 695, 732 (11th Cir. 2004). Like her other claims, Colonial is
entitled to summary judgment on this claim because Guy cannot establish a *prima facie* case.

Even assuming *arguendo* that Guy could make out a *prima facie* case, she cannot create a
triable issue with respect to Colonial's legitimate, non-discriminatory reason for not promoting
her to the Program Director position. As previously established, *see* §A(2)(b), *supra*, Guy
cannot show that she was qualified for the position or that another "equally or less qualified
individual" filled the position. She lacked specific, objective qualifications for the position
which, in stark contrast, Sean Tesoro possessed, *e.g.*, broker experience and NASD licenses. In
sum, Guy cannot establish her *prima facie* case because she was not qualified for the position, let
alone so clearly more qualified for the position than Sean Tesoro such that a reasonable juror
could infer discriminatory intent from the comparison.

### 2. GUY CANNOT REBUT COLONIAL'S LEGITIMATE NONDISCRIMINATORY REASON *VIS-À-VIS* HER PROMOTION CLAIM.

Even if the court assumes *arguendo* that Guy has somehow established a *prima facie*
case, her claims of gender and/or age discrimination *vis-à-vis* the appointment of Sean Tesoro to
the Program Director position still fail as a matter of law because she cannot show that
Colonial's legitimate, non-discriminatory reasons for promoting Tesoro were a pretext to
discriminate against Guy based on her sex or age. As set out in detail above, *see* §A(4)(b),
*supra*, Colonial promoted Tesoro rather than Guy to the Program Director position because she
lacked the necessary NASD licenses and experience necessary to develop and coordinate sales
training and product support for Colonial's NASD licensed Financial Consultants and to
negotiate new and existing selling agreements with NASD licensed product providers/vendors.
Furthermore, as the Manager of the Family Insurance section, Guy bears some responsibility for

its lackluster performance.  In the absence of any evidence that Colonial based its decision on age, or that Colonial did not believe that Tesoro was more qualified, and particularly in this case where the decisionmaker, Linda Green, is herself a member of the protected class, the Court should not second guess Colonial's decision.  *Elrod*, 939 F.2d at 1470 ("Federal courts 'do not sit as a super-personnel department that reexamines an entity's business decisions.' ") (*quoting Mechnig v. Sears, Roebuck & Co.*, 864 F.2d 1359, 1365 (7th Cir. 1988) (citations omitted)); *see also Hellums v. Webster Indus., Inc.*, 97 F. Supp.2d 1287 (M.D. Ala. 2000) (holding that the court should avoid second guessing hiring decisions of employer in the absence of any evidence that the decision was based on age).[28]

Clearly, Colonial has satisfied its exceedingly light burden of production and produced evidence that could allow a reasonable fact finder to conclude that Colonial's decision to promote Sean Tesoro rather than Guy to the Program Director position was not made for a discriminatory reason.  For these reasons, to the extent that Guy asserts a failure to promote, Colonial is entitled to summary judgment on her claim.

## V.    CONCLUSION

For the foregoing reasons, Colonial submits that this Court should enter summary judgment in its favor as to all counts against it contained in the Complaint, dismiss the Complaint and all claims in this lawsuit against Colonial with prejudice, and tax costs against plaintiff.

---

[28]  *See also Steger v. General Elec. Co.*, 318 F.3d 1066, 1076 (11th Cir. 2003) ("This Court repeatedly has stated that it will not second-guess a company's legitimate assessment of whether an employee is qualified for a particular position"); *Alexander v. Fulton County, Ga.*, 207 F.3d 1303, 1341 (11th Cir. 2000) (Title VII case) ("[I]t is not the court's role to second-guess the wisdom of an employer's decisions as long as the decisions are not racially motivated.").

Respectfully submitted,


/s/Christopher W. Weller
Christopher W. Weller (WEL030)
**CAPELL & HOWARD, P. C.**
P.O. Box 2069
Montgomery, Alabama 36102-2069
(334) 241-8000

**THE COLONIAL BANCGROUP, INC. &
COLONIAL BANK, N.A.**
David B. Byrne, Jr. (ASB-0354-R69D)
General Counsel
One Commerce Street
Montgomery, Alabama 36104

**ATTORNEYS FOR DEFENDANTS**


## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing upon counsel of record *viá* U.S. Mail:

Susan Guy, Pro Se
974 Lewis Road
Deatsville, Alabama 36002

DONE this the 21st day of August, 2006.

/s/Christopher W. Weller
Of Counsel